**HOME SAVINGS BANK, F.S.B., by its Conservator, the RESOLUTION TRUST CORPORATION, Plaintiff–Appellee,**

**v.**

**Robert B. GILLAM, Defendant–Appellant.**

**No. 90–35765.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 21, 1991.

Decided Dec. 31, 1991.

Thomas Amodio, Birch, Horton, Bittner Prestinger & Anderson, Anchorage, Alaska, for plaintiff-appellee.

Howard S. Trickey, Jermain, Dunnagan & Owen, Anchorage, Alaska, for defendant-appellant.

Before TANG, REINHARDT and RYMER, Circuit Judges.

TANG, Circuit Judge:

Robert Gillam is the former chief executive officer and major shareholder of the Home Savings Bank ("Bank"). In 1987, the financially-troubled Bank entered into a Capital Forbearance Agreement with the Federal Home Loan Bank Board ("FHLBB") designed to stem the flow of money out of the Bank. In May 1988, the Bank's Board of Directors created a legal indemnification fund for its officers by transferring $300,000 out of the Bank. The Board also voted generous severance payments for some of its officers, including a $177,000 severance benefit for Gillam. The Resolution Trust Corporation ("RTC"), as conservator of the Bank, subsequently sued Gillam to recover the severance benefits paid to him upon his resignation and opposed Gillam in an interpleader action contesting control over the legal indemnification fund. The district court granted summary judgment for the RTC, ordering Gillam to return the $177,000 and awarding the legal indemnification fund to the RTC. The district court also granted the RTC pre-judgment and post-judgment interest and attorney's fees. Gillam appeals. We reverse the award of attorney's fees. We affirm all other aspects of the district court's judgment.

## BACKGROUND

The Bank is a state-chartered, federally insured savings and loan institution. The Bank began experiencing financial trouble, specifically a significant reduction in its capital structure, in 1986. In an effort to avoid a takeover by the FHLBB for violation of federal minimum capital requirements, *see* 12 C.F.R. § 563.13, the Bank submitted a proposed Capital Forbearance Agreement to the FHLBB in July 1987. Three months later, in anticipation of finalizing the Forbearance Agreement, the Bank's president, Joseph Miller, engineered a change in the personnel manual's salary and benefit provisions. The district court found that Miller made the changes to preserve management discretion in personnel matters.

The Bank and the Federal Savings and Loan Insurance Corporation ("FSLIC") signed the Forbearance Agreement in December 1987. The four-year agreement imposed strict federal supervision over many aspects of the Bank's daily operations. Large transfers of money out of the Bank, whether as loans, investments, dividends, or new compensation, required prior notification to, and a statement of no objection by, FSLIC.

The agreement further provided that, notwithstanding FSLIC's active supervisory role in the Bank's affairs, "the board of directors of the Bank shall at all times continue to have ultimate responsibility for the safe and sound management of the Bank." FSLIC reserved the right to terminate the Agreement if the Bank either failed to adhere to the terms of the Agreement or engaged in any unsafe or unsound practices.

Of particular relevance to the current litigation is section 16 of the Forbearance Agreement, which regulates compensation terms. Section 16.1 reads:

The Bank ... without prior written notice of no objection by the [FSLIC] Supervisory Agent, shall not:

A. make any increase in the rate of compensation to any of its directors, or senior officers, or agree to do so;

\*      \*      \*      \*      \*      \*

C. employ any person to serve as a senior officer who is not so employed or appointed as of the date of this Agreement; employ any person pursuant to an agreement that is not terminable at the will of the employer; or enter into, or amend or renew any new collective bargaining agreements, pension or profit sharing, bonus, severance pay, retirement, fringe benefit, or other employee benefit plans, or other employment contract with any employee, director, or officer, or amend any such contracts that

are presently binding on the employer....

By early 1988, the Bank was losing approximately $250,000 a month. The staggering losses fueled concern among the officers and directors about their potential personal liability in litigation arising from the Bank's financial woes. Efforts to obtain officers and directors insurance proved unfruitful. About the same time, the Board also began investigating ways to provide special severance benefits to certain key personnel such as Gillam and Miller.

A special meeting of the Board was convened in May. Noting that "time is of the essence," the Board approved new severance benefits for top officers and directors. The package guaranteed Gillam a year's salary, a car allowance, and insurance benefits. The Board also approved the creation of a legal indemnification fund. To this end, the Board ordered the transfer of $300,000 to the Jim Stanley Corporation, where attorney Jim Stanley would administer the fund. An indemnification committee, consisting of Gillam, Miller, and two others, was granted irrevocable control over the fund.

When FSLIC learned of the Board's actions, its supervising agent for the Bank, Collin Cook, immediately protested. Cook advised the Board that the severance payment plan violated the prohibition in section 16.1 of the Forbearance Agreement against the unilateral creation of new severance benefits. The severance plan, Cook also asserted, lacked a justifiable business purpose. Cook characterized the transfer of $300,000 out of the Bank to create a legal indemnification fund as imprudent, in light of the Bank's precarious financial condition, and a thinly veiled attempt to establish a preference for the officers and directors over other Bank creditors. Cook demanded the return of the $300,000 and suspension of the new severance plan.

When the Board repeatedly refused to comply with Cook's requests, FSLIC demanded and obtained the resignations of Gillam and Miller. Gillam then collected $177,480 in severance benefits. Other high-level bank officials also resigned and received benefits under the newly enacted severance plan, costing the Bank $281,980.

In August 1988, new counsel for the Bank wrote to Gillam and demanded return of the severance benefits. Gillam refused. A new Board of Directors for the Bank also instructed Stanley Corporation to return the $300,000 legal indemnity fund. The Corporation did not comply. Gillam and Miller separately requested that the Stanley Corporation pay the $300,000 to their attorneys to cover their impending legal expenses. Faced with these competing demands, the Stanley Corporation filed an interpleader action, 28 U.S.C. § 1335, in federal district court.

The Bank filed a separate action against Gillam, Miller, and others in state court seeking to recover the severance payments. Miller subsequently removed the action to federal district court. 28 U.S.C. § 1441. In December 1989, the interpleader and severance benefits actions were consolidated.

In the meantime, the Bank's finances continued to falter. FSLIC was appointed conservator for the Bank in March 1989. In January 1990, the district court substituted the RTC for the Bank in both cases.

In July 1990, the district court granted summary judgment to the RTC in both the interpleader legal indemnification fund action and the suit to recover severance payments. With respect to the indemnification fund, the district court noted that nothing in Alaska law mandated the creation of external, irrevocable indemnification funds. "[C]reation of any external fund prior to the commencement of litigation," the court emphasized, was unusual. The Board's failure to seek prior approval from FSLIC for this action, the district court continued, violated the Forbearance Agreement. More specifically, the district court ruled that "the legal indemnity fund constituted an impermissible 'fringe benefit' within the meaning of Section 16.1 of the forbearance agreement." The district court then imposed a constructive trust on the funds held by the Stanley Corporation and or-

dered their return, with interim interest, to the RTC.

The district court turned next to the severance payments and held that "the directors were even less justified in that action." Creating new severance benefits "resulted in precious funds being transferred out of the Bank at a critical time." Establishing the plan and disbursing funds without seeking FSLIC's prior approval, the district court held, "violated both the letter and the spirit of the forbearance agreement." The district court concluded that Gillam had been unjustly enriched by the severance payments and, accordingly, imposed a constructive trust on the money and ordered it refunded to the RTC.

In October 1990, the district court entered a separate order on the RTC's request for pre- and post-judgment interest and attorney's fees. The court awarded post-judgment interest and costs against Gillam in accordance with 28 U.S.C. §§ 1920, 1961.

Observing that federal common law on attorney's fees and pre-judgment interest had not yet developed, the court turned to Alaska law for guidance. The court awarded pre-judgment interest to the RTC at a rate of 10.5 percent annually, finding that it "is the policy of the State of Alaska that interest ... be payable 'on money after it is due.'"

The district court also followed Alaska's "English Rule" on awards of attorney's fees, which provides for the routine award of at least partial fees in civil cases. Alaska Civil Rule 82. The court accordingly ordered Gillam and Miller to pay attorney's fees for both the interpleader and severance payment actions.

Gillam timely noticed his appeal to this court.[1]

## DISCUSSION

### I.   *The RTC's Right of Action*

Gillam argues that the RTC lacks a right of action to proceed against him in federal court. Specifically, Gillam contends that neither the Forbearance Agreement nor the relevant regulations authorizes the Bank (through the RTC) to sue its former officers in federal court for unsafe and unsound banking practices.

■ Whether a right of action exists under a statute is a matter of statutory construction, which we review de novo. *See Saratoga Sav. & Loan Ass'n v. Federal Home Loan Bank Bd.*, 879 F.2d 689, 691 (9th Cir.1989) (questions of statutory construction reviewed de novo); *Rapid Transit Advocates, Inc. v. Southern Cal. Rapid Transit Dist.*, 752 F.2d 373, 376 (9th Cir. 1985) (whether a right of action exists is a matter of statutory construction).

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") expressly authorizes the RTC to prosecute this action by placing the RTC in the shoes of the Bank. FIRREA vests the RTC with "the same powers and rights to carry out its duties with respect to institutions [in its conservatorship] as the Federal Deposit Insurance Corporation has under sections 11, 12, and 13 of the Federal Deposit Insurance Act [12 U.S.C. §§ 1821, 1822, and 1823]." 12 U.S.C. § 1441a(b)(4). Pursuant to 12 U.S.C. § 1821(d)(2)(B)(ii), the RTC may "collect all obligations and money due the institution [in conservatorship]." FIRREA, through the Federal Deposit Insurance Act, further charges the RTC with "tak[ing] such action as may be ... necessary to put the insured depository institution in a sound and solvent condition." 12 U.S.C. § 1821(d)(2)(D)(i).

■ Money improperly removed from the Bank in violation of the Forbearance Agreement constitutes "obligations and money due" the Bank within the meaning of 12 U.S.C. § 1821(d)(2)(B)(ii). The recovery of $600,000 improperly diverted for officers' personal use also qualifies as an action "necessary to put the [Bank] in a sound and solvent condition" under 12 U.S.C. § 1821(d)(2)(D)(i). *Cf. Hoffman v. Federal Deposit Ins. Corp.*, 912 F.2d 1172, 1174–75 (9th Cir.1990) (FDIC has authority to order restitution of bank funds lost

---

1.  Miller's appeal was voluntarily dismissed on       August 2, 1991.

through unsafe and unsound practices of officers); *Federal Sav. & Loan Ins. Corp. v. Molinaro,* 889 F.2d 899, 906 (9th Cir. 1989) ("We do not lightly restrict FSLIC's ability to recover from officers of insolvent savings and loan associations."). In short, Congress, through FIRREA, expressly mandated the RTC to pursue the type of recoupment action presently before us.

■ That the district court entertained doubts as to its jurisdiction over both the interpleader and the removed state action (due to the absence of complete diversity) prior to the RTC's substitution does not affect the propriety of the RTC's action against Gillam. The district court's original exercise of jurisdiction was proper because it had jurisdiction to decide its own jurisdiction. *See Land v. Dollar,* 330 U.S. 731, 739, 67 S.Ct. 1009, 1013, 91 L.Ed. 1209 (1947); *Augustine v. United States,* 704 F.2d 1074, 1077 (9th Cir.1983); 13A C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure* § 3536 (2d ed. 1984). By the time the district court ruled that it had jurisdiction, the RTC had been substituted as a party for the Bank. FIRREA expressly provides for federal court jurisdiction over actions to which the RTC is a party. 12 U.S.C. § 1441a(*l*)(1).[2] Thus whatever jurisdictional qualms the district court might have experienced prior to the RTC's entry into the case, the substitution of the RTC for the Bank removed any question about the district court's jurisdiction. *See Resolution Trust Corp. v. Lightfoot,* 938 F.2d 65, 67 (7th Cir.1991).

## II. *The Protective Order*

Prior to the district court's ruling on summary judgment, Gillam sought to depose Larry Pedersen, a former Bank officer and director, and Reid Judd, the Federal Deposit Insurance Corporation's oversight manager for the Bank. The RTC moved for a protective order on the ground that the testimony sought was not relevant to the matters at issue on summary judg-

ment. The district court agreed and granted a protective order in August 1989.

■ Gillam argues that the district court improperly foreclosed discovery relevant to the summary judgment motion when it entered the protective order preventing the depositions of Pedersen and Judd. We review for an abuse of discretion the district court's entry of a protective order. *Kirshner v. Uniden Corp. of Am.,* 842 F.2d 1074, 1079 (9th Cir.1988).

Mr. Pedersen was expected to attest to the urgent need for legal indemnification of officers, with specific reference to claims litigated against him. Mr. Pedersen was also prepared to state that the promise of indemnification induced him to remain with the Bank for some time. Mr. Judd was scheduled to testify concerning whether other banks taken over by the FDIC had created legal indemnification funds prior to closure.

The district court did not abuse its discretion in granting the protective order. A court's refusal to permit certain discovery before ruling on summary judgment is not erroneous if the discovery sought did not pertain to "the theory of liability used by the district court." *Molinaro,* 889 F.2d at 903.

■ As in *Molinaro,* neither Mr. Pedersen's nor Mr. Judd's testimony would have been responsive to the theory of liability on which we affirm the district court. One of the grounds on which the district court granted summary judgment was that the creation of a legal indemnification fund and the enhancement of severance benefits "without prior written notice of no objection" by FSLIC violated section 16.1 of the Forbearance Agreement. Whatever its relevance for other purposes, Mr. Pedersen's deposition would not have been relevant on the issue of the Bank's failure to obtain a no-objection letter as required by the Forbearance Agreement. Mr. Judd's testimony concerning the practices of other banks

---

**2.** Section 1441a(*l*)(1) states:

Notwithstanding any other provision of law, any civil action, suit, or proceeding to which the [Resolution Trust] Corporation is a

party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction over such action, suit, or proceeding.

not operating under forbearance agreements was also irrelevant to the determination of whether this Bank's actions violated section 16.1 of the Forbearance Agreement. In short, Mr. Pedersen's and Mr. Judd's information was too generalized and too tangential to the liability theory on which we affirm to make its suppression an abuse of discretion.

### III. *The Grant of Summary Judgment*

■ We review de novo the district court's entry of summary judgment. *Molinaro,* 889 F.2d at 901. Summary judgment is appropriate if, viewing the evidence in the light most favorable to the non-moving party, no genuine issues of material fact remain and the moving party is entitled to judgment as a matter of law. *Id.*

### A. The Legal Indemnification Fund

Gillam argues that the district court should not have granted summary judgment for the RTC in the interpleader action concerning entitlement to the legal indemnification fund. Gillam contends that genuine issues of material fact remained that supported his claim to the fund. Gillam insists that the officers' good faith and business judgment are central considerations in determining the proper disposition of the fund and that these are inherently questions of fact. To buttress his position, Gillam points out that federal and state law, as well as the Bank's by-laws, mandated indemnification. Finally, Gillam argues that whether the officers breached their fiduciary duties is a question of fact inappropriate for resolution on summary judgment.

■ We hold that the district court did not err in granting summary judgment in the interpleader litigation over the indemnification fund. The district court ruled in favor of the RTC on the ground that the indemnification fund constituted a new "fringe benefit" for officers, which section 16.1 of the Forbearance Agreement prohibited the Board from enacting without FSLIC's prior approval or statement of no objection. Gillam's objections primarily argue around the district court's decision.

Whether the fund was created in good faith or through the exercise of business judgment might indeed be questions of fact. But they are not questions of fact comprised within the district court's theory of liability on which we affirm. Gillam does not specifically contest the district court's characterization of legal indemnification as a "fringe benefit" for officers under the Forbearance Agreement. And the Forbearance Agreement strictly forbade the creation of new fringe benefits for officers absent FSLIC's notice of no objection.

The Agreement's proscription against new fringe benefits does not depend upon the motivations or intent of Board members. The Agreement, moreover, supplanted the Board's traditional authority over salaries and fringe benefits. Consequently, the district court did not need to decide whether the creation of a legal indemnification fund fell within the discretion afforded officers under the business judgment rule. The Forbearance Agreement suspended the Bank officers' traditional prerogatives in this area of bank management. The factual questions of good faith and business judgment thus were not material to the grant of summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.")

■ The cases cited by Gillam, holding that salary and benefit decisions generally fall under the rubric of the business judgment rule, are unhelpful. None of them involved officers whose actions were constrained by an agreement with FSLIC. *See, e.g., International Ins. Co. v. Johns,* 685 F.Supp. 1230, 1238 (S.D.Fla.1988), *aff'd,* 874 F.2d 1447 (11th Cir.1989); *Hastings–Murtagh v. Texas Air Corp.,* 649 F.Supp. 479, 483 (S.D.Fla.1986). Showing what officers may reasonably do in ordinary circumstances does not undercut the district court's determination of what this Bank's officers could and could not do under the Forbearance Agreement.

Gillam's efforts to rely on statutes and internal by-laws mandating indemnification is likewise unavailing. Assuming some form of indemnification was required, none of the laws commanded banks to set up $300,000 indemnification funds external to the financial institution and irrevocable by the board of directors, especially not at a time when the bank was under a mandate to preserve capital and to halt the hemorrhage of $250,000 in monthly losses. *See Hoffman,* 912 F.2d at 1175; *Federal Sav. and Loan Ins. Corp. v. Bass,* 576 F.Supp. 848, 852–53 (N.D.Ill.1983). In any event, nothing excused the Board from first seeking FSLIC's approval or statement of no objection to the plan, as required by section 16 of the Forbearance Agreement.

### B. The Severance Payments

Gillam argues that the district court should not have granted summary judgment ordering restitution of his severance benefits because questions of fact remained in the case. Specifically, Gillam cites as factual issues precluding summary judgment (1) the insolvency of the Bank, (2) the reasonableness of the severance benefits as compared to those offered by other financial institutions, (3) the necessity of the benefit plan, (4) the propriety of the benefit program under the Bank's internal rules, (5) the consistency of the decision with the Board members' fiduciary duties, and (6) the role of public policy in the district court's decision.

We affirm the grant of summary judgment in the severance payments litigation. As with the legal indemnification fund, Gillam's identification of factual disputes misses the point of the district court's ruling. The district court granted summary judgment because section 16.1 of the Forbearance Agreement prohibits the Bank from "enter[ing] into, or amend[ing] or renew[ing] any ... severance pay" plans for its officers and directors, absent prior notice to, and a statement of no objection from, FSLIC. Gillam's factual issues are quite simply not implicated by the district court's judgment. For example, whether the Bank was insolvent or not, the Forbearance Agreement constrained the Board's

authority to award new severance benefits. Nor did the district court need to judge the Board's actions by either fiduciary or general community business standards. At the time the severance plan was enacted, the propriety of the Board's actions was measured by the strict terms of the Forbearance Agreement. The practices of other banks and other bank officers not operating under similar agreements are irrelevant.

Likewise, the district court did not need to address the business necessity of the benefits. Even were the new benefits imperative, that did not relieve the Board of its obligation to notify FSLIC in advance and to await its response before increasing the benefits, in accordance with section 16.1 of the Forbearance Agreement.

Gillam contends that prior notification of FSLIC was not necessary because the increase in severance benefits for a few top officers, including himself, was not a new, renewed, or amended severance policy as defined by section 16.1. Gillam notes that changes in the Bank's personnel manual in April 1985, prior to the initiation of the Forbearance Agreement, vested the Bank's president and others with the discretion to enhance severance benefits.

Notwithstanding the changes in the personnel manual, the increase in Gillam's and others' severance benefits fell within section 16.1's compass. The terms of the Forbearance Agreement eliminated whatever discretion resided with Bank officers concerning severance benefit increases. To hold otherwise would render section 16.1's proscription against new, renewed, or amended severance pay packages nugatory. The words "severance pay" in section 16.1 would be reduced to unenforceable surplusage. The district court's determination that this was not the Agreement's intent was not erroneous.

■ Lastly, Gillam challenges the district court's statement that the public interest must be vindicated and the severance payments returned. The public interest, though, was not the basis for summary judgment. Public policy only influenced

the district court's election of an appropriate remedy—restitution by means of a constructive trust. The district court had the authority to impose an equitable remedy in what was essentially an equitable action. *See Federal Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 562 (5th Cir.1987) ("As receiver for [the savings and loan], there is no doubt that FSLIC has the right (and even the responsibility) to pursue equitable causes of action such as a constructive trust, an accounting, and restitution.... From those equitable causes of action flow the courts' ability to fashion [equitable] relief...."); *see also Federal Trade Comm'n v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112–13 (9th Cir.1982) (when plaintiff pursues equitable action, court may fashion full equitable relief, consistent with statutory purposes and limitations).

In sum, we affirm the district court's grant of summary judgment in the severance pay litigation. Factual disputes only preclude summary judgment when they are material to the resolution of the case. *See Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also Tzung v. State Farm Fire & Casualty Co.*, 873 F.2d 1338, 1340 (9th Cir.1989). The factual issues identified by Gillam were not material to the theory of liability on which we affirm.

IV. *FIRREA's Heightened Liability Standard*

 In his last effort to overturn the district court's grant of summary judgment, Gillam argues that the district court should have applied FIRREA's heightened tort liability standard to this case. Section 1821(k) of the Federal Deposit Insurance Act, incorporated into FIRREA by 12 U.S.C. § 1441a(b)(4), provides:

> A director or officer of an insured depository institution may be held personally liable for monetary damages in any civil action by, on behalf of, or at the request or direction of the [FDIC or RTC] ... for gross negligence, including any similar conduct or conduct that demonstrates a greater disregard of a duty of care (than gross negligence) including intentional tortious conduct, as such terms are defined and determined under applicable

State law. Nothing in this paragraph shall impair or affect any right of the [FDIC or RTC] under other applicable law.

12 U.S.C. § 1821(k).

Gillam contends that a finding of gross negligence on his part was a condition precedent to the district court's authority to order restitution of the severance payments or to assign control of the legal indemnification fund to the RTC. Whether FIRREA's heightened liability standard applies to this action is a question of statutory construction, which we review de novo. *Saratoga*, 879 F.2d at 691.

Gillam's argument fails for two reasons. First, Gillam raises this issue for the first time in the history of this litigation in his reply brief. "It is well established in this circuit that the general rule is that appellants cannot raise a new issue for the first time in their reply briefs." *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990) (citations and quotations omitted). Nothing justifies Gillam's delaying until his reply brief to raise this issue here. By the time Gillam filed his opening brief in this court, FIRREA had been in operation for a year and a half. Gillam offers no explanation or justification for his neglect.

Second, we hold that FIRREA's gross negligence standard does not apply in this case. The plain text of section 1821(k) reveals that the heightened liability standard applies only to RTC actions seeking to establish personal liability for an officer's violation of a "duty of care" and to recover "monetary damages." The RTC did not seek to establish that Gillam breached any duty of care, nor did the RTC seek damages *per se.* The RTC's suit aimed to recoup money disbursed in violation of an agreement or contract the Bank had with FSLIC. The issue was thus whether the two disbursements violated the agreement and whether Gillam had been unjustly enriched, not whether Gillam personally violated a duty of care. Negligence and gross negligence simply are not factors in this legal equation. Furthermore, the remedy imposed by the court did not in any sense

reflect the monetary damage suffered by the Bank as a result of the improper expenditures.

The type of action pursued by the RTC here falls within section 1821(k)'s qualification that the heightened liability standard shall not "impair or affect any right of the [FDIC or RTC] under other applicable law." Such other applicable laws must, at a minimum, include other types of legal actions permitted by the Federal Deposit Insurance Act. Section 2[8] of the Act constitutes separate and distinct authorization for the FDIC to obtain restitution of money that has unjustly enriched a bank officer or director: 12 U.S.C. § 1818(b)(6)(A). By analogy, section 1821(k)'s liability standard also would not govern RTC actions seeking restitution for unjust enrichment.

The legislative history offers further evidence that section 1821(k) does not apply to the type of action prosecuted by the RTC against Gillam. In a section-by-section analysis of FIRREA shortly before its enactment, the bill's promoters in the Senate (Senators Riegle and Garn) stated that the heightened liability standard

> does not prevent the FDIC [or RTC] from pursuing claims under State law or under other applicable Federal law ... on an alternative theory such as *breach of contract* or breach of fiduciary duty.

135 Cong.Rec. S6912 (daily ed. June 19, 1989) (emphasis added).

In short, we need not decide the difficult issue of section 1821(k)'s retroactive application to this case. Even assuming section 1821(k) did operate retroactively, it would not help Gillam because the RTC's suit did not seek to establish his personal liability or to punish him with an assessment of monetary damages. The question of Gillam's negligence, gross negligence, or other level of culpability was not encompassed by the RTC's equitable effort to recoup money with which Gillam had been unjustly enriched in violation of the Forbearance Agreement.

## V. *The Award of Pre– and Post–Judgment Interest and Attorney's Fees*

■ Gillam takes exception to the district court's grant of pre- and post-judgment interest and attorney's fees to the RTC. The district court's award of attorney's fees and interest is reviewed for an abuse of discretion. *See Lange v. Penn Mut. Life Ins. Co.*, 843 F.2d 1175, 1184 (9th Cir.1988) (attorney's fees); *United States v. California State Bd. of Equalization*, 650 F.2d 1127, 1132 (9th Cir.1981) (interest), *aff'd mem*, 456 U.S. 901, 102 S.Ct. 1744, 72 L.Ed.2d 157 (1982); *see also Monsanto Co. v. Hodel*, 827 F.2d 483, 485 (9th Cir.1987) (interest). The district court's departure from the American Rule limiting awards of attorney's fees is reviewed de novo, however. *See Perry v. O'Donnell*, 759 F.2d 702, 704 (9th Cir.1985).

### A. Pre–Judgment Interest

■ The award of pre-judgment interest in a case arising under federal law rests within the sound discretion of the court. *Board of Equalization*, 650 F.2d at 1132. The district court's purpose in assessing the interest was to make the Bank whole for money improperly removed during a critical shortage of capital. Failure to assess such interest would effectively award Gillam a severance benefit in the amount of interest gained on the money since its removal from the Bank. Awards of pre-judgment interest have been upheld under similar circumstances. *See, e.g., Monsanto*, 827 F.2d at 485 ("The effect of a refusal to grant prejudgment interest in this case would be to allow an interest free loan to appellants on funds belonging to [another].... Disallowance of interest would encourage delay in payment."); *Board of Equalization*, 650 F.2d at 1132 ("Awards of pre-judgment interest are governed by considerations of fairness, and are awarded when it is necessary to make the wronged party whole.") (citation omitted). Accordingly, the district court's award of prejudgment interest was not an abuse of discretion.

## B. Post–Judgment Interest

The district court awarded post-judgment interest pursuant to 28 U.S.C. § 1961(a) which provides: "Interest *shall* be allowed on any money judgment in a civil case recovered in a district court." (Emphasis added.) Given the mandatory language with which section 1961 speaks, Gillam only contests the award of post-judgment interest on the ground that summary judgment was improper. Because we affirm the district court's grant of summary judgment, we likewise affirm the award of post-judgment interest. The award properly compensates the Bank and the RTC for the loss of the money between the time of judgment and the time of Gillam's payment. *See Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835, 110 S.Ct. 1570, 1576, 108 L.Ed.2d 842 (1990) (" 'The purpose of post-judgment interest [under section 1961] is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant.' " (quoting *Poleto v. Consolidated Rail Corp.*, 826 F.2d 1270, 1280 (3d Cir.1987))).

## C. Attorney's Fees

The district court relied on Alaska law as authority for its award of attorney's fees to the RTC. The district court noted that Alaska follows the English tradition of routinely awarding at least partial attorney's fees to the prevailing party in civil actions. *See Malvo v. J.C. Penney Co.*, 512 P.2d 575, 586–87 (Alaska 1973). The court turned to Alaska law because it considered the federal common law undeveloped on the issue of attorney's fees in RTC actions.

■ Because established federal common law disfavors the award of attorney's fees in federal question cases absent an express congressional directive, we hold that the district court erred in applying Alaska's law on attorney's fees. Incorporation of state law occurs in federal question cases only in the absence of federal common or statutory law. Use of state law in such instances avoids the creation of new federal common law. However, when federal common law already exists, as it does here, the Supreme Court has refused to apply state law. *California ex rel. State Lands Comm'n v. United States*, 457 U.S. 273, 284, 102 S.Ct. 2432, 2439, 73 L.Ed.2d 1 (1982) (refusing to follow California law in part because "this is not a case in which federal common law must be *created*") (emphasis in original). With respect to non-statutory awards of attorney's fees, federal common law not only exists, but also directly conflicts with the state rule relied on by the district court.

Since the Supreme Court's decision in *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the rule in federal courts has been that, absent an express statutory command, attorney's fees will not be awarded in civil cases. *Id.* at 262, 95 S.Ct. at 1624 ("[T]he circumstances under which attorneys' fees are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine.") (footnote omitted); *see also Donovan v. Burlington N., Inc.*, 781 F.2d 680, 682 (9th Cir.1986) ("In this country, 'the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser.' " (quoting *Alyeska*, 421 U.S. at 247, 95 S.Ct. at 1616)).

■ *Alyeska* recognized only three exceptions to this general prohibition. Fees may still be awarded if (i) a plaintiff preserves or recovers a fund for the benefit of others; (ii) the losing party acts in bad faith; or (iii) a party willfully disobeys a court order. 421 U.S. at 257–59, 95 S.Ct. at 1621–22; *see also Perry*, 759 F.2d at 704. The common benefit exception permits parties who have successfully preserved or recovered a fund for the benefit of other non-litigants, as well as for themselves, to recover fees either from the fund or from the other beneficiaries of the litigation. *Alyeska*, 421 U.S. at 257, 95 S.Ct. at 1621; *Reiser v. Del Monte Properties Co.*, 605 F.2d 1135, 1137–38 (9th Cir.1979). Attorney's fees are awarded to prevent the non-litigants from enjoying a windfall; all beneficiaries are made to share in the cost of litigation. *Id.* The beneficiaries of the

RTC's efforts are the Bank, the federal government, and taxpayers in general, not Gillam. Because the party ordered to pay fees is not a beneficiary of the court's judgment, the common benefit exception does not apply here. The district court made no finding of bad faith. Nor were fees assessed as punishment for the willful violation of a court order. This fee award is thus not encompassed within any of *Alyeska*'s exceptions.

The district court referred to public policy reasons supporting an award of attorney's fees. Absent Congress's explicit provision for the recovery of fees, however, courts are not free to pick and choose which statutes are worthy of special enforcement incentives and rewards. In words that speak directly to the district court's rationale, the Supreme Court specifically eschewed vesting federal courts with the authority

> to jettison the traditional rule against nonstatutory allowances to the prevailing party and to award attorneys' fees whenever the courts deem the public policy furthered by a particular statute important enough to warrant the award.
>
> ... [I]t would be difficult, indeed, for the courts, without legislative guidance, to consider some statutes important and others unimportant and to allow attorneys' fees only in connection with the former.

*Alyeska*, 421 U.S. at 263–64, 95 S.Ct. at 1624–25.

■ Because Congress has not seen fit to provide for awards of attorney's fees in cases to which the RTC is a party and because none of *Alyeska*'s exceptions apply in this case, the district court erred in assessing attorney's fees against Gillam. Resort to state law is inappropriate in federal question cases when controlling federal common law exists and directly conflicts with the state rule.[3]

## CONCLUSION

■ FIRREA gave the RTC a right of action to proceed against Gillam. The district court did not err in barring the depositions of Mr. Pedersen and Mr. Judd because their testimony was not relevant to the ground on which the court granted summary judgment. We affirm the grant of summary judgment both in the interpleader action and in the suit to recover severance payments because the factual disputes identified by Gillam are not material to the theory of liability employed by the district court. Gillam's argument that section 1821(k)'s heightened liability standard applies retroactively to his case also fails. Gillam neglected to raise this issue until his reply brief. Moreover, the heightened liability standard has no application to actions for restitution and breach of contract, where an officer's level of culpability is immaterial. Finally, the awards of pre- and post-judgment interest are affirmed as proper exercises of discretion. The award of attorney's fees is reversed, however. The court's reliance on Alaska law was inappropriate because this was a federal question case and Alaska law directly conflicts with both established federal common law and Supreme Court admonitions against the award of attorney's fees absent specific direction from Congress.

The decision of the district court is AFFIRMED IN PART and REVERSED IN PART.

---

**3.** We also note that Alaska has no special interest in the collection of attorney's fees in federal question cases litigated in federal court. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728–29, 99 S.Ct. 1448, 1458–59, 59 L.Ed.2d 711 (1979) (extent to which failure to incorporate state law in federal question case would disrupt state interests is a factor in choice of law). Alaska has no unique interest in regulating the behavior of parties in federal court or in promoting the enforcement of federal statutes with a nationwide impact.