UNITED STATES of America, as trustee for the Kalispel Indian Tribe and individual allottees, Plaintiff–Appellee,

and

Kalispel Indian Tribe, Intervening–Plaintiff,

v.

PEND OREILLE PUBLIC UTILITY DISTRICT NO. 1, a municipal corp., Defendant,

and

Department of Natural Resources, State of Washington, Defendant–Intervenor–Appellant.

UNITED STATES of America, as trustee for the Kalispel Indian Tribe and individual allottees, Plaintiff–Appellee,

and

Kalispel Indian Tribe, Intervening–Plaintiff,

v.

PEND OREILLE PUBLIC UTILITY DISTRICT NO. 1, a municipal corp., Defendant–Appellant,

and

Department of Natural Resources, State of Washington, Defendant–Intervenor.

UNITED STATES of America, as trustee for the Kalispel Indian Tribe and individual allottees, Plaintiff–Appellant,

and

Kalispel Indian Tribe, Intervening–Plaintiff,

v.

PEND OREILLE PUBLIC UTILITY DISTRICT NO. 1, a municipal corp., Defendant–Appellee,

and

Department of Natural Resources, State of Washington, Defendant–Intervenor.

UNITED STATES of America, as trustee for the Kalispel Indian Tribe and individual allottees, Plaintiff,

and

Kalispel Indian Tribe, Intervening Plaintiff–Appellant,

v.

PEND OREILLE PUBLIC UTILITY DISTRICT NO. 1, a municipal corp., Defendant–Appellee,

and

Department of Natural Resources, State of Washington, Defendant–Intervenor–Appellee.

UNITED STATES of America, Plaintiff,

and

Kalispel Indian Tribe, Plaintiff–Intervenor–Appellant,

v.

PEND OREILLE PUBLIC UTILITY DISTRICT NO. 1, a municipal corp., Defendant–Appellee,

and

Department of Natural Resources, State of Washington, Defendant–Intervenor–Appellee.

Nos. 88–3617 through 88–3619, 88–3669, 92–35504.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 12, 1993.

Decided July 14, 1994.

Elizabeth Ann Peterson, U.S. Dept. of Justice, Washington, DC, for plaintiff-appellee-appellant.

Allen H. Sanders, Evergreen Legal Services, Seattle, WA, for plaintiff-intervenor-appellant.

Jerry K. Boyd, Spokane, WA, for defendant-appellant-appellee.

J. Lawrence Coniff, Asst. Atty. Gen., Olympia, WA, for defendant-intervenor-appellant-appellee.

Before: BROWNING, SCHROEDER, and FLETCHER, Circuit Judges.

JAMES R. BROWNING, Circuit Judge:

This is the second opinion of this court dealing with issues arising out of a judgment entered by the district court in an action brought by the United States on behalf of the Kalispel Indians against the Public Utility District No. 1 of Pend Oreille County, Washington. The Federal Power Commission issued a license to the Utility to build and operate the Box Canyon Dam on the Pend Oreille River, which forms the western boundary of the Kalispel Indian Reservation in northeastern Washington.[1] The United States filed suit alleging the Utility had flooded Reservation land and seeking damages and injunctive relief. The Kalispel Indian Tribe and the State of Washington intervened. The Tribe joined the trespass claims advanced by the United States on its behalf. Both the Tribe and the State claimed title to the riverbed.

The district court divided the trial into three phases. In the first two phases, the court considered whether the Utility had flooded Reservation land and whether the Tribe or the State owned the bed of the river. In our first opinion, reported at 926 F.2d 1502, we sustained the district court's holdings that the Utility had trespassed upon the Reservation by raising the level of the river and that the State, rather than the Tribe, owned the bed of the river.

In the final phase of the trial, the district court considered the remedy for the Utility's trespass. On this appeal, the Utility repeats its contention that the district court erred in concluding the Utility had trespassed on Reservation land. The Utility also contends the court erred in dismissing its counterclaim in condemnation against the United States and the Tribe, refusing to grant declaratory relief regarding the calculation of future damages, and awarding prejudgment interest on the damage award. The Tribe and the United States argue the district court erred in failing to include the value of the land as part of the power project in determining the amount of damages, refusing to grant injunctive relief, and denying the Tribe leave to amend its complaint to allege a claim for water and fishing rights.

We adhere to our determination that the Utility trespassed on the Tribe's lands; we affirm the denial of the Utility's motion for declaratory relief and the Tribe's motion to amend its complaint; and we reverse the damage and prejudgment interest awards and the denial of injunctive relief.

## I. LIABILITY FOR TRESPASS

The Utility argues there was no trespass because Article 33 of the project license authorizes the Utility to flood Reservation land and compensate the Tribe at the rate the Utility pays private land owners—the rental value of the land as grazing land. It is too late for the Utility to challenge the existence of a trespass. That question was resolved against its position by the district court, and we affirmed the district court's conclusion in our first opinion. During phase three of the trial, the district court found the Utility knew it had no right to flood Reservation land, but flooded it anyway, a finding supported by substantial evidence.[2]

In any event, the Utility's interpretation of Article 33 is without merit. The

1. Title to the Reservation, including the land along the river, is held in trust by the United States for the Kalispel Indian Tribe and individual Indian allottees.

2. The Utility obtained easements to flood land neighboring the Reservation. It flooded the land at issue here only after the Kalispel Indians refused to grant similar easements.

language of Article 33 neither authorizes the Utility to flood Reservation land, nor specifies the amount of damages the Utility would owe the Kalispel Indians if it did. The first clause requires the Utility to operate the Dam in such "a manner as not to interfere with or damage Indian land of the [K]alispel Indian Reservation."³ The second clause provides an administrative procedure for compensating the Indians if the Utility breaches the prohibition against flooding Reservation land: "[I]n the case such damage should occur as a result of the operation of the project, the Indians shall be compensated in the manner and amount as determined by the Secretary, after consultation with the [K]alispel Indian Community Council and Licensee." Nothing indicates creation of this administrative remedy was intended to affect the rights of the Tribe and the United States if they choose instead to file a trespass action in federal court, as they did.

▉▉▉▉ If read as the Utility suggests, Article 33 would authorize the taking of Reservation land by inverse condemnation in violation of federal law and the use of such land in a manner contrary to the provisions of the Federal Power Act. The Utility may not condemn tribal lands embraced in a reservation under the Power Act or any other federal statute, *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians,* 466 U.S. 765, 786 n. 29, 104 S.Ct. 2105, 2117 n. 29, 80 L.Ed.2d 753 (1984); *FPC v. Tuscarora Indian Nation,* 362 U.S. 99, 113–14, 80 S.Ct. 543, 551–52, 4 L.Ed.2d 584 (1960), and may not take the land of individual Indian allottees through inverse condemnation, *United States v. Clarke,* 445 U.S. 253, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980). Section § 4(e) of the

Power Act prohibits the use of reservation lands for power production unless the Commission finds "that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired" and the Secretary of the Interior imposes "such conditions as the Secretary ... shall deem necessary for the adequate protection and utilization of such reservation." 16 U.S.C. § 797(e). Section 10(e)(1) of the Power Act prohibits the use of tribal lands embraced within a reservation unless the Commission fixes a "reasonable annual charge" for the use of the lands and the Indian tribe approves the charge. 16 U.S.C. § 803(e)(1). None of these conditions were met. Neither the Commission nor the Secretary approved the flooding of the Reservation; the Commission did not find the Reservation could be flooded without interfering with the purpose for which the Reservation was created; the Secretary did not determine what conditions might be necessary for the protection and utilization of the Reservation; the Commission did not fix an annual charge for use of Reservation land, and the Tribe was not asked to approve such a charge.

These omissions apparently resulted from the failure of the Utility to disclose that Reservation land would be flooded by the project. The application and the license itself indicated the project would be so constructed and maintained that the Reservation would not be affected. The license stated the water level would be higher in normal flows "for possibly 24 miles upstream." The reservation is located 30 miles upstream. The license also incorporated a map locating the project boundary six miles downstream from the Reservation.⁴

---

**3.** In a letter to the Commission proposing Article 33, the Secretary of the Interior explained the purpose of the provision:

> Indian lands and interests on the Reservation will not be adversely affected if backwater from the dam is not allowed to raise the water-surface levels adjacent to Indian lands during flood flows. The spillway gates at Box Canyon should be so operated that the maximum river water surface elevations adjacent to Indian lands will not damage those lands.

**4.** The Utility notes that its license was amended in 1961 to allow it to raise the backwater at the

Albeni Falls Dam upstream from the Reservation by an amount that would result in flooding Reservation lands adjacent to the river. The amendment, however, could not authorize the Utility to flood Reservation land. As noted in the text, the Utility could not use such land for the project unless the Secretary and the Commission authorized the use under § 4(e) and § 10(e) of the Power Act. Moreover, the 1961 amendment provided: "It is not necessary to extend the existing Project Boundary further upstream because of the fact that the limitation of not exceeding the natural elevation at Cusick for 90,000 cfs flow [as

Based on the language of Article 33, the statutory scheme governing the use of Indian reservation lands, and the other evidence in the record, we conclude the project was to be operated in such a way as not to flood Reservation land, and that Article 33 was intended to reinforce that prohibition and provide a remedy for its violation, rather than to confer blanket authority upon the Utility to trespass on Reservation land.[5]

## II. DAMAGES

### A. Primary Jurisdiction.

■ The Tribe contends the Secretary of the Interior has primary jurisdiction to determine questions relating to damage to Reservation land due to operation of the Dam by virtue of Article 33 of the license,[6] and asks that these proceedings be stayed to allow the Secretary to exercise that jurisdiction.[7] The doctrine of primary jurisdiction is inapplicable. The Secretary's authority to pass on damage issues arises from Article 33 of the project license, not from a grant of jurisdiction by Congress pursuant to a comprehensive regulatory scheme. *United States v. General Dynamics Corp.*, 828 F.2d 1356, 1362–66 (9th Cir.1987). Congress authorized

the Secretary to impose conditions in a project license "necessary for the adequate protection and utilization of [a] reservation," 16 U.S.C. § 797(e), but Congress neither required the Secretary to include Article 33 in the license nor placed the damage issue "within the special competence of an administrative body" under "a regulatory scheme." *United States v. Western Pac. R.R.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956).

### B. Standard for Determining Damages.

■ The district court concluded the Utility flooded approximately 186.7 acres of Reservation land for 30 years without an easement or court order, and awarded damages totalling $46,231. The court apparently concluded Washington law controlled and under that law the Tribe was entitled to recover only the rental value of the land for grazing.

The Tribe and the United States argue damages for trespass on Indian lands are controlled by federal law and the damage award was inadequate under federal law because it did not reflect the value of the land as a part of the Box Canyon Dam project.[8]

proposed by the Amendment] *does not change the maximum effect of the back-water upstream of the Project Boundary.*"

5. The Utility's fall-back position is that if trespass occurred, damages are to be determined in accordance with state law pursuant to 16 U.S.C. § 814 of the Power Act. That section applies to the exercise by a licensee of the power of eminent domain to acquire private lands for a power project. No such proceeding was or could have been utilized here to acquire the use of tribal lands on the Reservation. *Escondido*, 466 U.S. at 786 n. 29, 104 S.Ct. at 2117 n. 29; *Tuscarora*, 362 U.S. at 113–14, 80 S.Ct. at 551–52.

6. Article 33 provides in full:

The project shall be operated by the Licensee in such a manner as not to interfere with or damage Indian land of the Calispel [sic] Indian Reservation, or, in case such damage should occur as a result of the operation of the project, the Indians shall be compensated by the Licensee in the manner and amount as determined by the Secretary of the Interior, after consultation with the Calispel [sic] Indian Community Council and the Licensee.

7. The Tribe seeks to supplement the record on appeal with evidence that it has initiated Article

33 proceedings before the Secretary. Federal Rule of Appellate Procedure 10(e) allows addition of anything "omitted from the record by error or accident." The evidence offered by the Tribe does not fall in this category.

8. The Utility does not dispute that federal law controls an action for trespass on Indian land. *See County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 234, 105 S.Ct. 1245, 1251, 84 L.Ed.2d 169 (1985) (right of Indians to occupy lands held in trust by the United States for their use is "the exclusive province of federal law"). The Supreme Court has recognized a variety of federal common law causes of action to protect Indian lands from trespass, including actions for ejectment, accounting of profits, and damages. *See, e.g., Marsh v. Brooks*, 49 U.S. (8 How.) 223, 232, 12 L.Ed. 1056 (1850) (action for ejectment); *United States v. Santa Fe Pacific R.R.*, 314 U.S. 339, 359, 62 S.Ct. 248, 257–58, 86 L.Ed. 260 (1941) (action for accounting); *County of Oneida*, 470 U.S. at 233–36, 105 S.Ct. at 1250–52 (action for damages); *United States v. Southern Pacific Transp. Co.*, 543 F.2d 676, 682–84 (9th Cir.1976) (action for damages). The federal interest in protecting the rights of Indians to occupy their lands is also expressed in the Federal Power Act which creates a specific statutory scheme governing the use of tribal lands embraced within

They reason that if inclusion of tribal lands within the Reservation had been anticipated, the Commission, in compliance with § 10(e) of the Power Act, would have included in the project license a provision fixing an annual charge for use of the lands and the annual charge would have been calculated on the basis of the value of the use of the land as part of the project. Since operation of the project in fact affected such lands, and since the Utility circumvented the provisions of § 4(e) and § 10(e) and preempted the fixing of an annual charge by flooding the lands without first securing a license to do so, the Tribe and the United States reason the Utility must pay the Tribe what the Tribe lost— the annual charge that would have been imposed if § 10(e) procedures had been implemented.

Whether the Commission would have determined the annual charge for use of tribal lands on this basis when the Utility's license was issued in 1952 is a matter of conjecture. Clearly § 10(e) did not require the Commission to do so. The Commission's discretion in determining appropriate annual charges was limited only by the requirement that the charges be "reasonable." *City of Vanceburg v. FERC*, 571 F.2d 630, 647 (D.C.Cir.1977) ("[T]he Commission has a discretion within the statute in fixing 'reasonable annual charges', and thus conceivably might use any one of several methods in calculating the charge...."); *Montana Power Co. v. FPC*, 298 F.2d 335, 340 (D.C.Cir.1962) (holding that the only question is "whether the end result is a reasonable one as the statute requires it to be").

In 1952, the regulations implementing § 10(e) specified the annual charge for use of

government lands "will be based on the estimated value for power purposes." As to tribal lands, however, the regulations provided only that the Commission should determine the annual charge "on a case-by-case basis under § 10(e) of the Federal Power Act." [9] The Commission considered adopting a general rule for determining annual charges for a licensee's use of tribal lands, but declined to do so, preferring instead to set annual charges according to the facts of each case. *Escondido Mut. Water Co.*, FERC Opinion No. 36–A, 6 F.E.R.C. (CCH) ¶ 61,189 (1979), 1979 WL 19964, *48, 1979 FERC LEXIS 1470, *172.[10]

The Tribe and the United States cite several cases for the proposition that under the regulations applicable in 1952, the annual charge fixed by the Commission for the use of tribal lands within the Reservation would have included the power site or shared benefits value of the land. In each of the cases cited, however, the license itself specified the charge fixed should be based "upon the commercial value of the tribal lands involved, for the most profitable purpose for which suitable, including power development." *Montana Power Co. v. FPC*, 459 F.2d 863, 869 (D.C.Cir.1972); *Confederated Salish and Kootenai Tribes v. United States*, 181 Ct.Cl. 739, 747, 1967 WL 8892 (1967); *see also Escondido Mut. Water Co. v. FERC*, 692 F.2d 1223, 1228 (9th Cir.1982), *amended*, 701 F.2d 826 (9th Cir.1983), *rev'd in part*, 466 U.S. 765, 104 S.Ct. 2105, 80 L.Ed.2d 753 (1984). Moreover, the language of the licenses at issue in *Montana Power* and *Confederated Salish* was taken directly from Commission regulation 14, section 5, which was su-

---

Indian reservations. *Tuscarora*, 362 U.S. at 118, 80 S.Ct. at 554–55.

**9.** 18 C.F.R. § 11.22 (1938) read:
*Use of Government dams, structures, tribal lands.* Reasonable annual charges for recompensing the United States for the use of Government dams ..., and for the use, occupancy, and enjoyment of the lands of the United States adjoining or pertaining thereto, will be based upon the estimated value for power purposes of the properties and privileges for which a license is issued: *Provided, however,* That annual charges ... for use of tribal lands embraced within Indian reservations shall be

determined in accordance with the provisions of section 10(e) of the Federal Power Act.

**10.** The Commission stated:
The Federal Power Act ... is silent as to how annual charges shall be computed.... We considered fixing the annual charges herein on the basis of the most profitable use of the tribal lands involved herein, as Interior advocates. But since we are not bound to fix [annual charges] in any particular manner, and since we are not bound to fix them in the same manner in every case, we have decided that the net benefits method is more appropriate in this instance.

perceded in 1938, before the license for the Box Canyon Dam project was issued.[11]

Although use of the value of the tribal lands as part of the power project in calculating the annual charge is not compelled by regulation or case law, we nevertheless conclude it is the most acceptable measure of damages for the Utility's trespass. As noted, the power site formula was reflected in the governing regulation prior to 1938, and the United States has advised the court this is the formulation now applied by the Commission in fixing annual charges for use of tribal lands on all power projects. Its use will also assure the Tribe will not suffer an uncompensated loss from the Utility's past failure to comply with the Power Act and will encourage future compliance.

The damage calculation urged by the Utility would encourage others to use Indian reservation lands for power production without complying with the Power Act. Applicants for licenses would be motivated to deny or minimize the anticipated effect of their project on Indian reservation lands (as the Utility did in this case) to avoid the risk that the Secretary and Commission might deny them use of the lands under § 4(e), or the Commission might require them to pay annual charges that included the power site value of the tribal lands under § 10(e). The Secretary and Commission cannot fulfill their respective obligations under § 4(e) and § 10(e) when applicants for Power Act licenses deny or understate the effect their projects will have on Indian reservation lands, or do not seek approval to use Indian reservation lands after they discover their projects include such lands.[12] Moreover, circumventing the Act would deprive the Indians of their right, granted under § 4(e) and § 10(e), to influence the terms upon which the licensee uses reservation land. Requiring the Utility to reimburse the Tribe for the most profitable use of its land will encourage future applicants for licenses to fully disclose the effect of their projects on Indian reservation lands and current licensees to seek approval to use such lands from the Secretary and Commission.

## III. PROSPECTIVE RELIEF

### A. Injunctive Relief.

■ The Tribe and the United States sought an injunction against future flooding of Reservation land. The district court denied relief on the ground the Indians would be fully compensated in a condemnation proceeding the Utility had filed to condemn a permanent flowage easement.[13]

■ The district court's ruling rested on an erroneous legal premise. Congress has the exclusive right to extinguish Indian title to lands, *United States ex rel. Hualpai Indians v. Santa Fe Pac. R.R.*, 314 U.S. 339, 347, 62 S.Ct. 248, 252, 86 L.Ed. 260 (1941), and has not authorized condemnation of land held in trust by the United States for the benefit of the Tribe. A licensee cannot condemn tribal lands under § 21 of the Power Act, 16 U.S.C. § 814, but must obtain Commission authorization to use such lands under § 4(e) and § 10(e) of the Power Act. *Escondido*, 466 U.S. at 786 n. 29, 104 S.Ct. at 2117 n. 29; *Tuscarora*, 362 U.S. at 113–14, 80 S.Ct. at 551–52.

The Utility may be able to condemn land held in trust by the United States for the benefit of individual Indian allottees under 25

---

1979 WL 19964 at *48, 1979 FERC LEXIS at *172.

**11.** Regulation 14, section 5, read:
When licenses are issued involving the use of tribal lands embraced within Indian reservations the commission will fix a reasonable annual charge for the use thereof, based upon the commercial value of the land for the most profitable purpose for which suitable, including power development. The charge shall commence upon date license is issued.
FPC Rules and Regulations 33 (1921).

**12.** A Power Act license may be amended to include Indian reservation lands. 16 U.S.C. § 803(b) (requires FERC approval for alterations to project); 18 C.F.R. § 4.200 (provides procedures for amending license). *See, e.g., Lac Courte Oreilles Band v. FPC,* 510 F.2d 198, 200 n. 4 (D.C.Cir.1975).

**13.** The Utility filed a counterclaim for condemnation in this action and initiated a separate condemnation proceeding, but the latter was stayed pending the outcome of this case, and (as dis-

U.S.C. § 357,[14] but this statute does not apply to land held in trust for the Tribe. *Nebraska Public Power Dist. v. 100.95 Acres of Land,* 719 F.2d 956, 961 (8th Cir.1983). Even if the Utility could condemn land held in trust for individual allottees, it could not occupy such land until it obtained judgment through a condemnation proceeding, *Clarke,* 445 U.S. 253, 100 S.Ct. 1127 (25 U.S.C. § 357 does not authorize inverse condemnation), which it has not done. In addition, since a significant portion of the land along the river is held in trust for the Tribe and would be flooded if the Utility flooded the land held in trust for individual allottees, the Utility could not raise the level of the river without violating the rights of the Tribe.

On remand, the district court should consider whether to issue an injunction in light of the correct legal principles and the Utility's and State's assertion that a large part of the Pacific Northwest would suffer a power shortage if the Utility were enjoined from flooding the land in question. If the district court decides to enjoin the flooding, it could fashion a remedy to minimize the harm such an injunction might cause. The court could, for example, enjoin the Utility from occupying Reservation land but stay the order to permit the Utility to seek an amendment to its license and satisfy the Power Act, especially § 4(e) and § 10(e).[15]

### B. Declaratory Relief.

Since the Box Canyon Dam license does not authorize the Utility to flood Reservation land, the district court acted in its discretion in refusing to grant declaratory relief regarding the calculation of future damages.

## IV. DENIAL OF TRIBE'S MOTION TO AMEND

■ Twenty four days before trial of the third phase was to begin, the Tribe sought leave to amend its complaint in intervention to allege a claim for water and fishing rights under *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). The district court denied the motion as untimely. We reversed because the district court had relied solely upon the Tribe's delay in bringing the motion without considering whether the opposing parties had been prejudiced. *United States v. Pend Oreille Public Utility Dist. No. 1,* 926 F.2d 1502, 1511–12 (9th Cir.1991). On remand, the district court found the delay had been unduly long and that the Utility would be prejudiced if the motion were granted. Fed.R.Civ.P. 15(a); *Moore v. Kayport Package Exp., Inc.,* 885 F.2d 531, 538 (9th Cir.1989) ("In deciding whether justice requires granting leave to amend, factors to be considered include the presence or absence of undue delay ... [and] undue prejudice to the opposing party....").

The Tribe's delay was extreme and unexplained. The legal basis for the claim had existed since 1908. The United States filed the action in March of 1980. The Tribe intervened in August of 1982. The Tribe moved to add the *Winters* claim seven years after the case began, five years after leave to intervene was granted, eleven months after the district court entered judgment against the Tribe in the second phase, approximately a month after the close of discovery in the third phase, and twenty-four days before the commencement of the third phase trial. The Tribe offered no explanation for the delay.

Prejudice to the Utility would have been substantial. The Tribe had alleged ownership of the beds and shores of the river but not of the water or fish. The extensive discovery undertaken prior to the second phase trial did not consider reserved water and fishing rights. Completed depositions would have to be retaken, new depositions of yet-to-be retained experts would have to be scheduled, and new state agencies would have to be brought into the action with new attorneys to represent the interests of those

---

cussed below) the former was dismissed for failure to serve the individual allottees.

**14.** This statute provides:

Lands allotted in severalty to Indians may be condemned for any public purpose under the laws of the State or Territory where located in the same manner as land owned in fee may be condemned, and the money awarded as damages shall be paid to the allottee.

25 U.S.C. § 357.

**15.** Presumably, such a stay would require the Utility to post a bond as security for the rights of the Tribe and the United States.

agencies.[16] Trial of the third phase would have been substantially delayed.

The district court's findings regarding undue delay and prejudice are not clearly erroneous and amply justify denial of the motion to amend. *See Western Shoshone Nat'l Council v. Molini*, 951 F.2d 200, 204 (9th Cir.1991); *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir.1990); *M/V American Queen v. San Diego Marine Const.*, 708 F.2d 1483, 1492 (9th Cir.1983).

## V. DISMISSAL OF UTILITY'S COUNTERCLAIM

█ The district court allowed the Utility to amend its answer to include a counterclaim in condemnation. The counterclaim was served on the attorneys for the United States and the Tribe. The court dismissed the claim for failure to serve the individual Indian allottees of the land the Utility sought to condemn. The Utility contends dismissal was improper because the United States represented both the Tribe and the allottees. We agree. When a party is represented by an attorney, service on that attorney is proper service. Fed.R.Civ.P. 5(b). The United States has discretion to represent the individual Indian allottees under 25 U.S.C. § 175. *Siniscal v. United States*, 208 F.2d 406, 410 (9th Cir.1953). The record establishes the United States and the Tribe represented all the Indian landowners in the case.[17] On remand, the district court should consider whether the Utility can state a claim for condemnation.[18]

## VI. PREJUDGMENT INTEREST

█ The Utility argues the district court erred in awarding pre-judgement interest.

The district court awarded prejudgment interest pursuant to state law, presumably because it calculated damages pursuant to state law. Since this case arises under federal law, the district court should apply federal pre-judgment interest principles. *Home Savings Bank, F.S.B. v. Gillam*, 952 F.2d 1152, 1161 (9th Cir.1991) ("The award of pre-judgement interest in a case arising under federal law rests within the sound discretion of the court."); *Board of County Commissioners v. United States*, 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313 (1939) ("The cases teach that interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable."). On remand, the district court should determine under federal law whether prejudgment interest is appropriate and the appropriate amount.

## VII. CONCLUSION

We reverse the district court's damage award and remand for recalculation according to the most profitable use of the flooded Reservation land. On remand, the district court may consider whether this is an appropriate case for prejudgment interest under federal law. We also reverse the district court's order denying an injunction and dismissing the Utility's counterclaim in condemnation. We affirm the denial of the Utility's motion for declaratory relief and the Tribe's motion to amend its complaint to add a *Winters* claim.

16. The Department of Natural Resources, which has authority over aquatic lands acquired by the State, is the only state agency named as a defendant in this action. The Department of Wildlife has authority over game and fish, and the Department of Ecology has authority over water. The district court found each agency was represented by a different division within the Washington State Attorney General's office.

17. The United States' complaint reads:

This is a civil action brought by the United States of America in its sovereign capacity and *as trustee on behalf of* the Kalispel Indian Tribe

(aka Kalispel Indian Community) and *individual Kalispel allottee[s] holding beneficial interest in allotte[d] trust lands* flooded by the Pend Oreille County Public Utility District No. 1. The Tribe's petition to intervene states: "Each Indian owner of lands affected by this law suit has signed a written authorization requesting and authorizing the United States and the Tribe to continue the foregoing case on his or her behalf."

18. As noted above, the Utility cannot condemn the land held in trust for the Tribe, and it cannot condemn the land held in trust for the individual allottees without affecting the Tribe's land.