J. Burk VOIGT, Plaintiff–Appellant,

v.

Richard D. SAVELL; Ronald J. Woods; Karrold Jackson; State of Alaska, Defendants–Appellees.

No. 94–35721.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 13, 1995.

Decided Nov. 22, 1995.

**1556**

Robert John and J. Burk Voigt, Fairbanks, Alaska, for plaintiff-appellant.

Frank S. Koziol, Anchorage, Alaska, for defendants-appellees.

Before: WRIGHT, ALARCON and CANBY, Circuit Judges.

### OPINION

ALARCON, Circuit Judge:

J. Burk Voigt appeals from the dismissal of this action against Richard D. Savell, Presiding Judge of the Fourth Judicial District of the Alaska Court System, and several senior members of the Alaska Court System's administrative staff.[1] Voigt contends that the district court erred in granting summary judgment in favor of the defendants on his claims under 42 U.S.C. § 1983 for unlaw-

---

1. In addition to Judge Savell, Voigt lists as defendants: Ronald J. Woods, Area Court Administrator for the Fourth Judicial District; Arthur Snowden II, Administrative Director of the Alaska Court System; Stephanie Cole, Deputy Administrative Director of the Alaska Court System; and Karrold Jackson, Personnel Director of the Alaska Court System. Voigt also names the state of Alaska as a defendant. The district court ruled that Voigt's claims for damages against the state are barred by the Eleventh Amendment. Voigt does not appeal from the dismissal of the State of Alaska on this ground.

ful discharge in violation of his First Amendment right to free speech and his Fourteenth Amendment right to procedural due process. He further contends that the district court erred in granting summary judgment in favor of the defendants on his claim under 42 U.S.C. § 1985 in which he alleges that the defendants conspired to discriminate against non-residents of Alaska when hiring court personnel.

We affirm the district court's judgment. With regard to the First Amendment claim, an application of the balancing test articulated in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), leads us to conclude that Voigt's speech is not entitled to constitutional protection in the context of his wrongful discharge action. We need not reach the merits of the Fourteenth Amendment claim because, in the district court, Voigt expressly abandoned his claim that the defendants violated his federal procedural due process rights. We affirm the district court's judgment on Voigt's section 1985(3) claim because Voigt does not have standing to assert this claim.

I

Voigt was hired on July 17, 1989 by the Alaska Court System as the Clerk of the Court and Assistant Area Court Administrator for the Fairbanks trial courts. He became a permanent tenured employee one year later. Voigt's relationship with Judge Savell can best be described as strained from at least as early as January of 1991. On January 15, 1991, shortly after assuming his duties as the new presiding judge, Judge Savell sent two memoranda to Voigt expressing concerns about the way in which Voigt was carrying out his responsibilities. One of these memoranda stated that an action Voigt had taken had not been authorized and was "a real blunder." Voigt responded on January 17, 1991, with a memorandum to Savell, in which he addressed what he considered "the development of a very serious impediment to our relationship." In this memoran-

dum, Voigt expressed confusion as to why Judge Savell considered him to be "the bad guy" with regard to various situations in the office and stated that "[w]hile your target may have been me personally, your indiscriminate and general comments deny the tremendous accomplishments my office has made[.]"

On March 24, 1992, Voigt received an intent-to-dismiss letter signed by defendants Savell and Woods. The five-page letter sets forth, as one of the reasons for Voigt's termination, his "consistent pattern of making inappropriate statements to subordinate employees[,]" such as "statements to supervisors and other court employees designed to torpedo the selection of Judith Cramer as [a court administrator]." The letter also states that Voigt had engaged in insubordinate behavior, citing Voigt's criticism of Judge Savell's decision to uphold a grievance filed by Roberta Demoski, a resident of Alaska who complained when Voigt did not hire her for a clerk position.[2] Because Voigt relies on his speech regarding these two incidents as the basis for his First Amendment claim, we set forth the facts surrounding these incidents in detail.

In early 1991, Judge Savell sought to hire a new Fairbanks Area Court Administrator ("ACA"). After interviewing four individuals for the position in mid-April, he first offered the position to Judith Cramer, an Ohio resident and that state court's administrator. Cramer declined the position. On Friday, April 26, 1991, Judge Savell offered the ACA position to Don Mills, an Oregon resident and that state court's administrator. Mills' accepted the position. The following Monday Cramer called Judge Savell and indicated that she had changed her mind and wanted to accept the position.

Judge Savell consulted by telephone with every judge he could find in the district in order to obtain their consent to the cancellation of Mills' employment contract so he could award the position to Cramer. Every

---

**2.** Several other grounds for termination were listed in the intent-to-dismiss letter. For instance, the letter lists eight separate instances in which Voigt is purported to have made inappropriate statements or engaged in inappropriate

actions in dealing with subordinate employees. The letter also states, among other things, that Voigt "misused court resources for improper or harmful purposes[,]" and "violated Personnel Rule 6.05 governing overtime compensation."

judge whom Judge Savell contacted approved of the proposed action, except for Judge Jay Hodges. Judge Savell then called Art Snowden, the Administrative Director of the Alaska Court System. Snowden approved the proposed action and authorized reimbursement to Mills for any losses or expenses he had incurred as a result of the recision of the agreement to employ him. Judge Savell notified Mills that the employment agreement had been cancelled and offered the position to Cramer.

Voigt was highly critical of the way Judge Savell handled the ACA hiring and of Judith Cramer, the person Judge Savell had chosen for the position. At a supervisors meeting attended by the various department heads of the Fairbanks court system on May 1, 1991, Voigt stated that Judge Savell "lacked honor and integrity" in his handling of the situation. He also questioned Judith Cramer's integrity and competency.

Voigt received a written reprimand on May 15, 1991 from Judge Savell. Judge Savell stated as one of the reasons for the reprimand Voigt's criticism to other staff members concerning the manner in which Judge Savell handled the hiring of Judith Cramer. Judge Savell informed Voigt that his comments went beyond mere disagreement with the decision to hire Cramer and the manner in which the selection was handled. He indicated that Voigt's comments appeared to be an attempt to "torpedo" the selection of Judith Cramer and to undermine any chance that she had of succeeding at her job.[3] Voigt testified at his deposition that he did not agree with the reprimand, but chose not to grieve it.

The second incident Voigt relies on as the basis for his First Amendment claim involves his criticism of a decision by Judge Savell to uphold a grievance filed by Roberta Demoski. On February 7, 1992, Voigt hired Margaret Crawford, a non-resident of Alaska, for a court clerk position, instead of Demoski, a court clerk from Galena, Alaska. Voigt testified that he hired Crawford, one of Judge Savell's former law clerks, because he felt that her legal experience, education, and personality best qualified her for the position.

Demoski filed an informal grievance following Voigt's decision. Judge Savell issued a decision on February 25, 1992, in which he concluded that Demoski's grievance was valid. He found that Voigt had applied improper criteria and had ignored a personnel rule when choosing Crawford over Demoski. Judge Savell ordered that Demoski be transferred to the Fairbanks clerk's office so she could be placed in the first available position for which she was qualified.

Voigt discussed Judge Savell's decision to uphold Demoski's grievance with at least five other court employees. He expressed his concern that Judge Savell was motivated to issue the decision because he was "out to get" him, especially since Voigt had spoken out regarding the Cramer/Mills incident. Voigt also speculated that Judge Savell and possibly other members of the court practiced an unspoken policy of discriminating against non-residents of Alaska who apply for positions with the court system. He voiced this concern to at least one other court employee. Voigt never expressed his concern over the allegedly discriminatory hiring practices to the media or to any person who was not a court employee.

After receiving the intent-to-dismiss letter on March 24, 1992, Voigt requested a pretermination hearing. The hearing was held on March 26, 1992, by Judge Niesje J. Steinkruger. The following day, Judge Steinkruger issued a decision in which she found reasonable grounds to believe that the charges against Voigt were true and supported the proposed action of termination of employ-

---

**3.** In pertinent part, the May 15, 1991 reprimand reads:

. . . . .

Your recent actions in dealing with court system employees locally have spread disharmony and have operated to undermine my attempts to improve case handling and cure some of the serious problems that we face. You may disagree with the decision I made in the selection of an Area Court Administrator, and you may likewise disagree with the manner in which I made that selection. Beyond disagreement, however, your actions appear to have been designed to torpedo my selection of Judith Cramer and to undermine any chance she has of being accepted in the building and succeeding at her job. . . .

ment. Voigt was formally terminated on March 27, 1992.

Voigt pursued the Alaska Court System's formal grievance process which provides for an investigation by the Administrative Director's office. The investigator upheld Voigt's termination. Voigt did not pursue the next step in the court system's grievance process which provides for a hearing before a hearing officer because he felt he was unlikely to receive a fair and impartial hearing.

## II

Voigt filed this action on April 17, 1992. The defendants filed a motion for partial summary judgment on August 9, 1993, seeking dismissal of all of Voigt's federal claims. The district court granted partial summary judgment in favor of the defendants on Voigt's federal claims and entered judgment dismissing all of Voigt's claims on June 20, 1994. Voigt's state claims were dismissed without prejudice to further proceedings in state court.

## III

Voigt asserts that the defendants failed to comply with the merit principles mandated by the Alaska Constitution, Alaska statutes, and the court system's personnel rules in terminating his employment. In addition, Voigt asserts that there were numerous procedural deficiencies with the way in which he was terminated, such as the defendants' failure to provide constructive and progressive discipline as required by the personnel rules. Finally, Voigt asserts that the defendants violated his First and Fourteenth Amendment rights and conspired to violate the constitutional rights of non-residents of Alaska.

We review a district court's grant of summary judgment de novo. *Home Sav. Bank v. Gillam,* 952 F.2d 1152, 1158 (9th Cir.1991). Summary judgment is appropriate if, with the evidence viewed in the light most favorable to the non-moving party, no genuine issues of material fact remain and the moving party is entitled to judgment as a matter of law. *Id.*

Though "a public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment[ ] ... the State's interests as an employer in regulating the speech of its employees 'differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" *Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983) (quoting *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734). Therefore, when a public employee asserts that he or she was discharged in retaliation for speech, "[o]ur responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government" without compromising the "common-sense realization that government offices could not function if every employment decision became a constitutional matter." *Id.* at 143, 147, 103 S.Ct. at 1688, 1690.

The threshold question in determining whether a public employee's termination violates the First Amendment is whether the employee's speech is entitled to constitutional protection. *Gillette v. Delmore,* 886 F.2d 1194, 1197 (9th Cir.1989). Voigt's speech is not protected in the context of public employment unless it involves a matter of public concern. *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689. "The inquiry into the protected status of speech is one of law, not fact." *Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. at 1691 n. 7.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690. Employee expression that can be fairly considered as relating to a matter of political, social, or other concern to the community may be characterized as speech involving a matter of public concern. *Id.* at 146, 103 S.Ct. at 1689.

In *Connick,* an assistant district attorney opposed her proposed transfer to a different section of the criminal court. *Id.* at 140, 103 S.Ct. at 1686. She circulated a questionnaire soliciting the views of her fellow staff members concerning office policies, office morale,

the level of confidence in certain named supervisors, and whether employees felt pressured to work in political campaigns. *Id.* at 141, 103 S.Ct. at 1687. The Supreme Court held that most of the questions in the questionnaire did not involve matters of public concern. *Id.* at 148, 103 S.Ct. at 1690–91. The Court reasoned that questions regarding office morale and policies did not relate to the performance of the district attorney as an elected official, nor did the assistant district attorney seek to inform the public that the district attorney's office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. *Id.* Instead, the questions relating to internal office issues were characterized as "mere extensions of [the petitioner's] dispute" with her supervisors over her transfer to another section. *Id.*

The Supreme Court concluded that the question whether any assistant district attorney ever felt pressured to work in political campaigns "touched upon a matter of public concern" because there is a "demonstrated interest in this country that government service should depend upon meritorious performance rather than political service." *Id.* at 149, 103 S.Ct. at 1691.

The Court's analysis of the facts in *Connick* is instructive to our resolution of the question whether Voigt's speech involved a matter of public concern. Voigt's comments consisted primarily of criticism regarding the way Judge Savell handled two internal personnel matters. Such information carries little public import in that it does not seek to inform the public of Judge Savell's failure to discharge his duties as a judicial officer. Rather, as in *Connick*, Voigt's speech regarding the ACA hiring and the Demoski grievance can be characterized primarily as an extension of his personal dispute with Judge Savell in which Voigt attempted to galvanize support for himself by weakening staff support for Judge Savell. *See McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir.1983) ("Speech by public employees may be characterized as *not* of 'public concern' when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to

the public's evaluation of the performance of governmental agencies.") (emphasis added); *see also Havekost v. U.S. Dept. of Navy*, 925 F.2d 316, 318–19 (9th Cir.1991) (independent licensee's petition to other licensees calling for the ouster of their representative due to disagreements over "minutiae of workplace grievances" contained no hint of a matter of public concern).

■ We cannot say, however, that Voigt's speech is of absolutely no relevance to the public's evaluation of the performance of the court system. The public has an interest in knowing whether the court treats its job applicants fairly. *See McKinley*, 705 F.2d at 1114 (speech concerning information needed by members of society to make informed decisions about the operation of their government warrants First Amendment protection). Because Voigt's speech referred to unfair discrimination against non-residents of Alaska, and to unfair treatment of job applicants in general, it can be characterized as touching on a matter of public concern. Thus, though we find that Voigt's speech primarily involved his personal disputes with Judge Savell, we cannot say that it was utterly devoid of public concern.

■ Because Voigt's speech touched on a matter of public concern, we must balance Voigt's interest, as a citizen, to comment on such matters, against the defendants' interest, as an employer, in promoting the efficiency of the public services it performs through its employees. *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. "[T]he State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Connick*, 461 U.S. at 150, 103 S.Ct. at 1692. Given the limited way Voigt's speech touched on issues of public concern, the defendants' burden should not be unduly onerous. *Id.* Nevertheless, a "real, not imagined, disruption is required, and the 'close working relationship' exception cannot serve as a pretext for stifling legitimate speech or penalizing public employees for expressing unpopular views." *McKinley*, 705 F.2d at 1115.

■ The *Pickering* analysis requires particularized balancing based on the unique

facts presented in each case. *Connick*, 461 U.S. at 150, 103 S.Ct. at 1691–92. The Supreme Court has explicitly declined to " 'attempt to lay down a general standard' " for determining when a public employer's interest outweighs the employee's First Amendment interest due to the " 'enormous variety of fact situations in which critical statements by [ ] public employees may be thought by their supervisors [ ] to furnish grounds for dismissal[.]' " *Id.* at 154, 103 S.Ct. at 1694. (quoting *Pickering*, 391 U.S. at 569, 88 S.Ct. at 1735). Thus, we reject Voigt's argument that the defendants are unable to demonstrate that Voigt's speech was sufficiently disruptive simply because Voigt was not discharged immediately after he engaged in his speech.

■ The *Pickering* analysis requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public. *Connick*, 461 U.S. at 150, 103 S.Ct. at 1691–92. For instance, the state may be justified in terminating the employee where the discharge is necessary to maintain "discipline by immediate superiors or harmony among coworkers" or to preserve the "kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." *Pickering*, 391 U.S. at 570, 88 S.Ct. at 1735.

The defendants presented evidence that Voigt's criticism of Judge Savell at staff meetings severely damaged office harmony and undermined Judge Savell's authority. Affidavits from three employees present at Voigt's staff meetings reveal that they felt Voigt's disparaging comments about Judge Savell and his choice for ACA were disruptive and undermining to office harmony. This evidence is undisputed.

■ The time, place, and manner of the employee's speech is also relevant to the question whether the employing agency's in-

stitutional efficiency was threatened. *Connick*, 461 U.S. at 153, 103 S.Ct. at 1693. In *Connick*, the Court concluded that "[t]he limited First Amendment interest involved [did] not require that [the defendant] tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." *Id.* at 154, 103 S.Ct. at 1694. The Supreme Court explained that the fact that the assistant district attorney exercised her right to speech at the office supported the defendant's fears that the functioning of his office was endangered. *Id.* at 153, 103 S.Ct. at 1693. The assistant district attorney's questionnaire also arose in the context of her employment dispute with the defendant regarding the application of an office policy. *Id.* Her attempts to solicit views regarding that policy from other staff were appropriately viewed by her employer as an attempt to threaten his authority. *Id.*

■ Voigt also exercised his right to speech at the office.[4] His statements were made in a staff meeting and in conversations with other supervisory level employees. His speech consisted of direct criticism of Judge Savell's handling of internal matters in which Voigt was directly involved. Moreover, his speech went beyond criticism of Judge Savell to include attempts to undermine the authority of a newly hired employee who would directly supervise Voigt. The form and context of Voigt's speech supports the defendants' concerns, reflected in Voigt's termination letter, that the functioning of the workplace was endangered.

The defendants have met their burden under *Pickering*. The limited First Amendment interest involved here does not require that the defendants tolerate actions which they reasonably believed caused disruption in the workplace and undermined the authority of Voigt's superiors.

Voigt argues that our recent decision in *Johnson v. Multnomah County, Oregon*, 48

4. Voigt leaked to the press a memorandum from Judge Hodges to Judge Savell which was highly critical of Judge Savell's handling of the ACA hiring. Memoranda between Judge Hodges and Judge Savell indicate that the working relationship between the two judges was undermined because Judge Savell thought Judge Hodges or

his staff had leaked the memorandum. While it is undisputed that Voigt's conduct in leaking this document was disruptive, the defendants have not demonstrated that it played a part in the decision to terminate Voigt. Therefore, we will not consider this disclosure or its disruptive effects as part of the *Pickering* analysis.

F.3d 420 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2616, 132 L.Ed.2d 858 (1995), compels a reversal of the dismissal of his section 1983 claim. We disagree. *Johnson* is readily distinguishable.

In *Johnson,* a public employee was disturbed by the fact that she did not receive her immediate supervisor's position when the position became vacant. *Id.* at 421. Johnson began making accusations about the new supervisor to coworkers and others which ranged from mismanagement and misuse of public resources, to allegations of criminal behavior. *Id.* at 424–25. We rejected the defendant's argument that because Johnson's statements were false and made with a reckless disregard for the truth, they could not be considered matters of public concern as a matter of law. *Id.* at 423. Instead, we held that "the recklessness of the employee and the falseness of the statements should be considered in light of the public employer's showing of actual injury to its legitimate interests, as part of the *Pickering* balancing test." *Id.* at 424.

In determining whether Johnson's speech involved a matter of public concern, we distinguished *Connick,* where the employee's speech arose in the context of an employee grievance *and* related to internal administrative procedures. *Id.* at 425. In contrast, Johnson's statements regarding criminal misuse of public funds, wastefulness, and inefficiency in managing and operating government entities were matters of *inherent* public concern. *Id.* at 425. Thus, despite the fact that Johnson "was embittered about not having been promoted," her speech did not constitute an "employee grievance" within the meaning of *Connick. Id.*

Finally, after applying the *Pickering* analysis, we held that the employer was not entitled to summary judgment on the ground that its legitimate administrative interests outweighed Johnson's First Amendment interest in free speech. *Id.* at 427. The employer had submitted evidence that Johnson's statements interfered with the close working relationship between Johnson and her supervisor, and undermined her supervisor's relationships with co-workers, subordinates and private vendors. *Id.* We held that the employer had to show more than mere disruption of office relationships. *Id.* We reasoned that the employer had to show actual injury to its *legitimate* interests in order to prevail under the *Pickering* test. *Id.* An employer does not have "a legitimate interest in covering up mismanagement or corruption and cannot justify retaliation against whistleblowers as a legitimate means of avoiding the disruption that necessarily accompanies such exposure." *Id.*

■ The instant case presents a significantly different factual scenario than *Johnson.* Johnson's speech included allegations of criminal wrongdoing and abuse of power. Such accusations involve matters of inherent public concern and the burden on the employer in demonstrating that its interests outweigh the First Amendment interest of the employee is correspondingly onerous. *See id.* at 426 (" '[t]he more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made' ") (citation omitted).

In contrast, Voigt's speech did not involve serious allegations of mismanagement or criminal corruption. Rather, Voigt criticized the wisdom and fairness of Judge Savell's decisions regarding internal personnel matters. In doing so, he touched upon matters of limited public concern. The facts in the instant matter parallel the situation described in *Connick,* where although the employee's speech was primarily related to an employee grievance, one aspect of it touched on a matter of public concern. *Connick,* 461 U.S. at 148–49, 103 S.Ct. at 1690–91. The Supreme Court made clear in *Connick* that where speech touches on an issue of public concern only in a limited sense, and arises within the context of an employee grievance, the employer's interest in avoiding disruption of the workplace may outweigh the employee's First Amendment interest. *Id.* at 150–53, 103 S.Ct. at 1691–93.

■ Assuming arguendo that Voigt can allege facts to support a wrongful discharge claim under state law, his cause of action cannot be converted into a federal constitutional claim simply because Voigt was a public employee. *See id.* at 154, 103 S.Ct. at

1694 ("it would indeed by a Pyrrhic victory for the great principles of free expression if the [First] Amendment's safeguarding of a public employee's right, as a citizen, to participate in discussions concerning public affairs were confused with the attempt to constitutionalize [an] employee grievance").

## IV

The district court dismissed as abandoned Voigt's claim under 42 U.S.C. § 1983 that the defendants deprived him of his Fourteenth Amendment procedural due process rights. Voigt received a pre-termination hearing, but chose to file an action in federal court rather than to pursue the full array of post-termination administrative remedies provided by state law. Throughout the proceedings before the district court, Voigt maintained that the defendants failed to comply with the state's clearly established substantive and procedural requirements. In his opposition to the defendants' motion for partial summary judgment, however, Voigt stated that he

> abandons his claim that procedural due process was violated by the manner in which the pre-termination hearing was conducted because *Loudermill* left undecided the specific minimal requirements of a pre-termination hearing. Defendants did not provide a full procedural due process hearing, but *Loudermill* and progeny have so far not required that.

Voigt argues that he did not abandon his contention that the defendants failed to follow the procedural requirements clearly established by *state* law, such as the constructive and progressive discipline procedures required by the Alaska Court System's personnel rules. Voigt asserts that an employer's personnel procedures provide the most obvious means for fixing the standards of procedural due process to which an employee is entitled.

■ Voigt's argument is based on the incorrect assumption that state law informs the second prong of the federal procedural due process analysis. This part of the analysis asks what process is due once it has been determined that the defendant has an inter-

est protected under the Fourteenth Amendment. *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 1153, 71 L.Ed.2d 265. What procedures are constitutionally required if the state seeks to deprive the defendant of a protected interest is determined by federal law. *See Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492–93, 84 L.Ed.2d 494 (once it is determined that the Due Process Clause applies because state law creates a property right, the remaining question regarding what process is due is *not* to be found in the state statute). Where the plaintiff has been deprived of his property interest in tenured public employment, the minimum procedures required for Fourteenth Amendment purposes are set forth in *Loudermill. See Wheaton,* 931 F.2d at 617 (court could not, on the record before it, determine whether the plaintiff had received all of the process he was due, but cited *Loudermill* for the "root requirement" of the Due Process Clause that the plaintiff receive a pre-termination hearing).

■ Voigt does not argue that the procedures established by Alaska state law are themselves inadequate to satisfy the federal constitution. *See Vitek v. Jones,* 445 U.S. 480, 491, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980) ("minimum [procedural] requirements [are] a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action"). Rather, he contends that the defendants failed to follow the extensive procedures established by state law, such as constructive and progressive discipline. That claim must be presented to an Alaska court. *Cf. Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 95–96, 104 S.Ct. 900, 905–06, 79 L.Ed.2d 67 (1984) (claim against state officials that the officials failed to follow the requirements of a state statute is a state law claim). By abandoning his argument that the defendants failed to satisfy the pre-termination hearing requirement established in *Loudermill,* Voigt abandoned his federal procedural due process claim.

V

The district court granted summary judgment in favor of the defendants on Voigt's claim under 42 U.S.C. § 1985(3), in part on the ground that Voigt lacks standing to assert this claim. Standing is a purely legal issue which requires our independent or de novo determination, without deference to the district court's conclusion. *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1454 (9th Cir.1995).

Voigt's section 1985(3) claim is based on two distinct theories: (1) the defendants conspired to deprive Voigt of his property interest in violation of his Fourteenth Amendment rights; and (2) the defendants conspired to violate the constitutional rights of non-resident job applicants, adversely affecting their rights to equal protection, privileges and immunities, and travel.

"Plaintiffs have standing under Section 1985 only if they can show they are members of a class that the government has determined 'require[s] and warrant[s] special federal assistance in protecting their civil rights.'" *Maynard v. City of San Jose*, 37 F.3d 1396, 1403 (9th Cir.1994) quoting *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536–37 (9th Cir.1992) (alterations in original). Voigt identifies non-residents of Alaska as a class warranting special federal protection under section 1985. Voigt, however, is a resident of Alaska, and was an Alaska resident at the time he was discharged. Thus, he cannot show that he is a member of the class he has identified. Voigt states no claim under section 1985(3) that the defendants conspired to violate *his* constitutional rights.

With regard to Voigt's claim that the defendants conspired to violate the constitutional rights of non-residents, Voigt argues that he has third-party standing to assert non-residents' rights. "Although a plaintiff generally 'cannot rest his claim to relief on the legal rights or interests of third parties,' the Supreme Court has recognized an exception where the plaintiff meets [each of] the following three criteria: first, the plaintiff must have a concrete interest in the outcome of the dispute; second, the plaintiff must have a close relationship with the party whose rights it is asserting; and third, 'there must exist some hindrance to the third party's ability to protect his or her own interests[.]'" *Wedges/Ledges of Cal., Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 62 (9th Cir. 1994) (citations omitted).

The "concrete interest" criterion asks whether the litigant has suffered some injury-in-fact, adequate to satisfy Article III's case-or-controversy requirement. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n. 3, 109 S.Ct. 2646, 2651 n. 3, 105 L.Ed.2d 528 (1989). Voigt contends that he was fired in part because he failed to adhere to the defendants' unspoken policy of discriminating against non-residents. If the constitutional claim Voigt advances on behalf of non-residents is vindicated, he may be entitled to damages associated with his termination or injunctive relief reinstating him to his position. This is sufficient to show that Voigt has a concrete interest in the outcome of the dispute. *See id.* (lawyer's stake in $170,000 of forfeited assets which he would almost certainly receive if the Sixth Amendment claim he advanced were vindicated meets injury-in-fact requirement).

The second criterion for third-party standing requires that Voigt have a close relationship with non-residents of Alaska. Voigt asserts that because he is in a position to hire non-residents as employees of the Alaska Court System, he has a close relationship with non-residents sufficient to satisfy this criterion. We disagree.

There are two underlying rationales for permitting third-party standing where there is a close relationship between the plaintiff and the third party. *Singleton v. Wulff*, 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976). Where the enjoyment of the right the plaintiff asserts is "inextricably bound up" with the activity the plaintiff wishes to pursue, the court "can be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit." *Id.* at 114–15, 96 S.Ct. at 2874. In addition, "the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effec-

tive a proponent of the right as the latter." *Id.* at 115, 96 S.Ct. at 2874.

Voigt's only connection to non-residents is that he may occasionally be in a position to hire a non-resident for a position within the state court system. Such an intermittent connection does not sufficiently advance the underlying rationales for permitting third-party standing. *See Constr. Ind. Ass'n, Sonoma Co. v. City of Petaluma,* 522 F.2d 897, 904 (9th Cir.1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976) (no standing where there was no special, on-going relationship between plaintiffs and those whose rights allegedly were violated).

A review of caselaw in which a close relationship warranted third-party standing further supports the conclusion that Voigt does not have a relationship sufficient to justify third-party standing. *See e.g., Griswold v. Connecticut,* 381 U.S. 479, 481, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965) (physician had standing to raise the constitutional rights of her patients where she was subject to criminal conviction under the challenged statute for serving those patients); *NAACP v. Alabama,* 357 U.S. 449, 458–59, 78 S.Ct. 1163, 1169–70, 2 L.Ed.2d 1488 (1958) (NAACP had standing to assert rights of its members not to reveal their affiliation with the Association because the NAACP and its members are in every practical sense identical); *Wauchope v. U.S. Dept. of State,* 985 F.2d 1407, 1411 (9th Cir.1993) (plaintiffs had standing to assert their mothers' equal protection rights in challenging the constitutionality of a statute that granted citizenship to foreign-born children of United States citizen fathers but not to those born of United States citizen mothers, because plaintiffs' interests coincided with and were equally as intense as their mothers' interests).

Because we conclude that Voigt lacks third-party standing to assert non-residents' rights, we need not reach the question whether non-residents themselves are members of a class entitled to protection under section 1985(3).

**VI**

After granting summary judgment in favor of the defendants on all of Voigt's federal claims, the district court dismissed Voigt's state law claims without prejudice to their renewal in state court. Voigt argues that the district court "repeatedly erred in attempting to identify and separate appellant's federal civil rights claims from his state wrongful discharge claims." This argument is without merit. Voigt has misconstrued the district court's legitimate attempts to manage the case in order to avoid deciding issues involving unsettled state law unless federal claims were properly before the court.

Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a claim if the court has dismissed all claims over which it has original jurisdiction. *Imagineering, Inc. v. Kiewit Pac. Co.,* 976 F.2d 1303, 1309 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993). The district court's dismissal of Voigt's state law claims was clearly within its discretion. *See id.* (" 'if the federal claims are dismissed before trial [ ] the state claims should be dismissed as well' ") (citation omitted).

**VII**

The district court denied Voigt's motion for reassignment pursuant to 28 U.S.C. § 455(a).[5] Disqualification of a district judge is appropriate under section 455(a) "where 'a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.' " *Yagman v. Republic Ins.,* 987 F.2d 622, 626 (9th Cir.1993) (citations omitted). We review a district court's denial of a motion for disqualification for abuse of discretion. *Id.*

Judge Singleton served for 20 years as an Alaska state court judge. Voigt argues that Judge Singleton's impartiality is reasonably questioned in this case because the defendants include a judge and several administra-

---

5. 28 U.S.C. § 455(a) reads:
   Any justice, judge, or magistrate of the United States shall disqualify himself in any proceed-

ing in which his impartiality might reasonably be questioned.

tors of the Alaska Court System. He also points out that two of Judge Singleton's former law clerks are involved in this case. One is a named as a defendant in the case and the other is serving as counsel for the defendants.

In denying Voigt's motion, Judge Singleton described his minimal contact with the Fairbanks bench and bar, including Judge Savell, to whom he was only recently introduced at a State–Federal Committee. Judge Singleton served as a superior court judge for the Third Judicial District during his service as a state judge. His chambers were in Anchorage, a significant distance from Fairbanks. His present federal court chambers are also in Anchorage and he has never lived in another community in Alaska. The judge explained that he has no ongoing personal relationship with any state judge or administrator named in the complaint or likely to be a witness. He further explained that with regard to his former law clerks, he has had no ongoing personal relationship with either of them in over fifteen years.

■ In rejecting the motion for reassignment, Judge Singleton quoted and applied the proper standard. A reasonable person informed of the foregoing facts would not conclude that Judge Singleton's impartiality might reasonably be questioned. The district court did not abuse its discretion in denying Voigt's motion seeking reassignment of the case to a different judge.

AFFIRMED.