135 F.3d 602
 28 Envtl. L. Rep. 20,555, 98 Cal. Daily Op.
Serv. 710,
98 Daily Journal D.A.R. 993
 UNITED STATES of America, Plaintiff,
and
Kalispel Indian Tribe, Plaintiff-Intervenor- Appellant,
v.
PEND OREILLE COUNTY PUBLIC UTILITY DISTRICT NO. 1, Defendant-Appellee,
and
Washington State Department of Natural Resources,
Defendant-Intervenor.
UNITED STATES of America, Plaintiff-Appellant,
and
Kalispel Indian Tribe, Plaintiff-Intervenor,
v.
PEND OREILLE COUNTY PUBLIC UTILITY DISTRICT NO. 1, Defendant-Appellee,
and
Washington State Department of Natural Resources,
Defendant-Intervenor.
UNITED STATES of America, Plaintiff-Appellee,
and
Kalispel Indian Tribe, Plaintiff-Intervenor- Appellee,
v.
PEND OREILLE COUNTY, Defendant-Appellant,
and
WASHINGTON STATE DEPARTMENT OF NATURAL RESOURCES, Defendant-Intervenor,
v.
KALISPEL INDIAN TRIBE, Plaintiff-Intervenor- Appellee.
 Nos. 95-36289, 96-35022 and 96-35045.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 7, 1997.
Decided Jan. 28, 1998.
 
 Elizabeth Anne Peterson, Department of Justice, Washington, DC, for plaintiff/appellant/cross-appellee.
 Allen Sanders, Columbia Legal Services, Seattle, Washington, for plaintiff-intervenor/appellant/cross-appellee.
 Jerry Boyd, Paine, Hamblen, Coffin, Brooke and Miller, LLP, Spokane, Washington, for defendant/appellee/cross-appellant.
 Appeal from the United States District Court for the Eastern District of Washington; Richard M. Bilby, District Judge, Presiding. D.C. No. CV-80-00116-RMB
 Before: FERGUSON, BOOCHEVER, and TROTT, Circuit Judges.
 Opinion by Judge BOOCHEVER; Dissent by Judge FERGUSON.
 BOOCHEVER, Circuit Judge:
 
 
 1
 The United States and the Kalispel Indian Tribe appeal, and the Pend Oreille County Public Utility District No. 1 cross-appeals, the district court's decision awarding damages to the Tribe for the utility's flooding of tribal lands. This is the third appeal to this court from continuing controversies arising out of the 1955 construction of the Box Canyon dam in Washington.FACTS
 
 
 2
 The statement of facts is drawn in large part from the two previous Ninth Circuit decisions in this case, United States v. Pend Oreille Public Utility District No. 1, 926 F.2d 1502 (1991) ("Kalispel I "), cert. denied, 502 U.S. 956, 112 S.Ct. 415, 116 L.Ed.2d 436 (1991), and United States v. Pend Oreille Public Utility District No. 1, 28 F.3d 1544 (9th Cir.1994), ("Kalispel II "), cert. denied, 514 U.S. 1015, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995).
 
 
 3
 The Kalispel Indian Reservation in northeastern Washington has as its western boundary the Pend Oreille river. In 1952, the Federal Power Commission ("FPC") (called after 1977 the Federal Energy Regulatory Commission, or "Commission") issued a license under § 4(e) of the Federal Power Act, 16 U.S.C. § 797(e), to the Pend Oreille County Utility District ("PUD") to build and operate the Box Canyon dam, downstream from the reservation. Section 4(e) states that the Commission is authorized and empowered
 
 
 4
 To issue licenses ... for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs ... or other project works necessary or convenient ... for the development transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction ... or upon any part of the public lands and reservations of the United States ... Provided, That licenses shall be issued within any reservation only after a finding by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired....
 
 
 5
 16 U.S.C. § 797(e).
 
 
 6
 Construction was completed in 1955. Before the dam was built, the water level of the river on the reservation's border rose to approximately 2041 feet during the spring, and receded to 2022 feet by late summer. After the dam was completed, the spring level remained at 2041 feet, but during the remaining months of the year the water level rarely dropped below 2032 feet. The dam thus caused land that formerly was flooded only in the spring (and could thus be used for agriculture when the waters receded) to remain underwater all year. The newly submerged lands were not included in the project boundary in PUD's license application, which maintained that Indian lands would not be affected by the dam.
 
 
 7
 In 1980, the United States brought a trespass action against PUD on behalf of the Kalispel Indian Tribe ("Tribe") and individual Indians who had been allotted land along the river. The complaint alleged that the dam unlawfully flooded riparian land traditionally used by the Tribe for agriculture (wild hay), and sought damages and injunctive relief under § 10(e) of the FPA, which provides that "when licenses are issued involving the use of ... tribal lands embraced within Indian reservations the Commission shall ... fix a reasonable annual charge for the use thereof...." 16 U.S.C. § 803(e)(1). The Tribe intervened, joining in the claim for trespass and asserting title to the riverbed. The State of Washington also intervened, alleging that it had title to the riverbed.
 
 
 8
 Trial was conducted in three phases. The first two phases considered whether PUD had flooded reservation land and whether the Tribe or the State owned the riverbed. The district court held that PUD had trespassed on the reservation by raising the level of the river, and held that the State owned the riverbed. The State and PUD appealed the trespass determination, and the Tribe appealed the holding on title to the riverbed. This court affirmed the district court in Kalispel I, 926 F.2d at 1507, 1510-11.
 
 
 9
 The final phase of the trial involved the remedy for PUD's trespass. In 1985, the district court concluded that PUD had flooded approximately 186.7 acres of reservation land for thirty years without an easement or court order, and awarded damages of $46,231. The court applied Washington state law and awarded the Tribe the rental value of the land for grazing. The Tribe and the United States filed a separate appeal from the damage award, arguing that federal law applied and that the damage award should have reflected the value of the land as a part of the Box Canyon Dam project.
 
 
 10
 In Kalispel II, this court reversed the damage award. First noting that PUD again contended, as it did in Kalispel I, that it did not trespass on reservation land, the court repeated its determination that PUD had trespassed: "the Utility knew it had no right to flood Reservation land, but flooded it anyway, a finding supported by substantial evidence." Kalispel II, 28 F.3d at 1547.
 
 
 11
 Second, the court considered the district court's use of state law to determine damages and concluded that federal law applied. Although § 10(e) of the FPA prohibits the use of tribal lands unless the Commission fixes a "reasonable annual charge" for the use of the lands, 16 U.S.C. § 803(e)(1), the Commission had not adopted a general rule for determining annual charges for a licensee's use of tribal lands. Id. at 1550-51. Nevertheless, the court discussed calculating the annual charge "on the basis of the value of the use of the land as part of the project," and concluded
 
 
 12
 Although use of the value of the tribal lands as part of the power project in calculating the annual charge is not compelled by regulation or case law, we nevertheless conclude it is the most acceptable measure of damages for the Utility's trespass.... [T]he power site formula was reflected in the governing regulation prior to 1938, and the United States has advised the court this is the formulation now applied by the [Federal Energy Regulatory] Commission in fixing annual charges for use of tribal lands on all power projects. Its use will also assure the Tribe will not suffer an uncompensated loss from the Utility's past failure to comply with the Power Act and will encourage future compliance.
 
 
 13
 .... Requiring the Utility to reimburse the Tribe for the most profitable use of its land will encourage future applicants for licenses to fully disclose the effect of their projects on Indian reservation lands and current licensees to seek approval to use such lands from the Secretary and Commission.
 
 
 14
 Id. at 1551. The court remanded for recalculation of the damage amount.
 
 
 15
 Third, the Tribe and the United States appealed from the denial of an injunction against future flooding. The district court had denied the injunction on the theory that the Tribe would be fully compensated in a condemnation proceeding for a permanent flowage easement filed by PUD. The Kalispel II court held that only Congress could extinguish Indian title to lands, and a licensee such as PUD could not condemn tribal lands but must obtain Commission authorization to use such lands. Id. The court noted that condemnation was a possibility for the lands held in trust for individual Indian allottees, but added that because any rise in water level would flood both Tribal and allotted land, in any event the rights of the Tribe would be violated. Id. at 1551-52. The court remanded to the district court to consider whether to issue an injunction "in light of the correct legal principles." Id. at 1552.
 
 
 16
 The Kalispel II court also reversed the dismissal for improper service of PUD's counterclaim in condemnation against individual Indian allottees, and remanded for determination under federal law whether to award prejudgment interest and for calculation of the correct amount. Id. at 1553.
 
 
 17
 The issues before the district court on remand were therefore (1) recalculation of the damage award; (2) determination under federal law of whether to award prejudgment interest, and if so, how much; and (3) consideration of an injunction against future flooding and a counterclaim for condemnation, should the Tribe and the United States renew the request for injunctive relief and the PUD its counterclaim for condemnation.
 
 
 18
 On July 24, 1995, the district court granted partial summary judgment to the United States and the Tribe, holding that PUD could not condemn the allotted land. The court later filed an amended judgment on damages and the remaining issues. The court awarded $593,795 to the Tribe ($3,189.63 per each acre), with prejudgment interest at 90 percent of prime rate equalling $2,436,396, for a total of $3,030,191. The court also granted a permanent injunction prohibiting PUD from flooding above 2028 feet, but stayed the injunction to allow PUD to apply to the Commission for a license amendment.
 
 
 19
 Once again the parties cross-appeal the damages award. PUD claims the district court used the wrong method of calculating damages, improperly allocated a percentage of the flooded land to the Tribe, erroneously awarded prejudgment interest, and failed to account for differing values of the land, resulting in a disproportionately high award. PUD also appeals from the grant of summary judgment denying condemnation. The United States and the Tribe contend that the court misapplied the method of setting damages, resulting in too low an award, and that the court abused its discretion in staying the injunction.
 
 ANALYSIS
 I. Power site formula
 
 20
 This court reviews de novo whether the district court used the correct legal standard in computing damages. Howard v. Crystal Cruises, Inc., 41 F.3d 527, 530 (9th Cir.1994).
 
 
 21
 The district court, noting that Kalispel II directed it to base its damage award on "use of the value of tribal land as part of the power project," considered these five factors in setting the amount of damages: (1) the cost of alternative power; (2) the amount of incremental generation gained by flooding the Indian land; (3) the share of that incremental generation to be attributed to the land; (4) the percentage of the land owned by the Tribe; and (5) the amount of compound interest to be paid on the damages. Initially, PUD claims the district court should not have used any version at all of the power site formula, and should have applied a "land appraisal method," or should have used the value of the land for grazing purposes (the measure of damages initially used by the district court at trial).
 
 
 22
 This argument is clearly without merit. In Kalispel II, this court rejected the district court's use of the grazing value of the land and specifically directed that, on remand, the district court use "the value of the tribal lands as part of the power project." 28 F.3d at 1551. While regulation or case law did not compel the use of the formula, the court concluded that "it is the most acceptable measure of damages for the utility's trespass," and added "[t]he damage calculation urged by the Utility would encourage others to use Indian reservation lands for power production without complying with the [Federal] Power Act." Id. The Kalispel II court thus required the use of the "power site formula," binding the district court.
 
 
 23
 The "law of the case" rule ordinarily precludes a court from re-examining an issue previously decided by the same court, or a higher appellate court, in the same case ... unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.
 
 
 24
 Pit River Home and Agricultural Coop. v. United States, 30 F.3d 1088, 1096-97 (9th Cir.1994) (quotations omitted). None of those exceptions applies here. We reject PUD's argument that alternative methods should have been used.
 
 II. Application of the power site formula
 
 25
 Kalispel II 's remand order did not give a detailed description of how the damages formula should be applied, and the parties dispute the court's application of the formula. The Tribe and the United States argue that the district court incorrectly put a "cap" on the damage award by attempting to avoid an increase in utility rates, and for this and other reasons reached too low a figure. PUD, in its turn, contends that the district court ignored easements, improperly failed to distinguish between tribal and allotted lands, and erred in dismissing its condemnation action.
 
 
 26
 Kalispel II directed the district court to use the "power site value" of the Indian lands to determine the value of the use of tribal lands as part of the power project, and to establish a reasonable charge based on that value. The district court chose the "sharing of the net benefits" approach to calculate power site value, citing the Commission's decision in Portland General Electric, 20 FERC 61,294 (1982), 1982 WL 40297 * 12 n. 28 (F.E.R.C.) ("PGE II") ("the net benefits approach can be an appropriate method for making an initial determination of annual charges.") In an earlier proceeding in Portland, the Commission characterized the approach "as the most reliable and least speculative means of determining a reasonable annual charge for the use of Tribal lands," and described the analysis as determining
 
 
 27
 (1) the cost of operating the ... project,
 
 
 28
 (2) the identity and cost of the next-best alternative,
 
 
 29
 (3) the difference between (1) and (2); i.e., the net benefit, and
 
 
 30
 (4) the allocation of net benefits amongst the parties.
 
 
 31
 Portland General Electric Co., 12 FERC 63,055 (1980), 1980 WL 24161, * 14 (F.E.R.C.) ("PGE I"); see Montana Power Co. v. Federal Power Commission, 298 F.2d 335, 338 (D.C.Cir.1962) (sharing of net benefits method "has considerable standing, and, if a particular method of evaluation is to be preferred, that method ... is the one to be used.") The steps can be described as follows:
 
 
 32
 (1) Cost of operations. This step determines the actual cost of owning, operating, and maintaining a hydropower plant.
 
 
 33
 (2) Alternative costs. This step determines what it would cost to generate the same amount of electric energy from a different source, for example, from the least-cost alternative generating plant that could have been constructed in the place of the hydropower project.
 
 
 34
 (3) Net benefits. These are calculated by subtracting the actual cost of the hydropower plant from the estimated cost of the alternative. This "net benefits" figure is the "power site value" of the project.
 
 
 35
 (4) Allocation. In this further step, the net benefits are allocated, or shared, between the operator of the project and the owners of the land. "Traditionally, net benefits are first divided equally between the landowners and project developers and then, in a second step, the landowner share is apportioned among the various individual landholders on the basis of the percentage of total project lands owned by each." PGE I, 1980 WL 24161 9 23. The end result of the calculation must be an annual charge "reasonable" under § 10(e). Montana Power, 298 F.2d at 340 ("Whether the Commission properly adopted and correctly applied the 'Sharing of Net Benefits' method of computing the additional payment is not the question. The question is, rather, whether the end result is a reasonable one, as the statute requires it to be.")
 
 
 36
 After stating that it would use the Commission's net benefits approach in determining trespass damages, the district court noted that the Commission has designated three purposes in its consideration of annual charges for the use of land:
 
 
 37
 (1) protecting the Act's goals of promoting development of hydroelectric power in the public interest;
 
 
 38
 (2) avoiding an unreasonable increase in the price of power to the consumers; and
 
 
 39
 (3) giving fair compensation to the Indians for use of their lands for the project.
 
 
 40
 (quoting PGE II, 1982 WL 40297 at * 5). This the court interpreted as "giving the finder-of-fact a reasonable amount of discretion in determining the setting of the rate and the damages due for past trespasses."
 
 
 41
 The parties agree that the Commission has used the formula as described in PGE I and PGE II, but they dispute the district court's application of the separate steps. While this court reviews de novo the determination of the proper elements of a damage award, In re Air Crash Disaster Near Cerritos, Cal., 982 F.2d 1271, 1275 (9th Cir.1992), the actual computation of damages following a bench trial is reviewed for clear error. Howard, 41 F.3d at 530.
 
 A. Using BPA power as alternative costs
 
 42
 The United States and the Tribe presented expert testimony from Dr. Gordon Taylor regarding how the Commission has used the power site formula to set annual charges. Dr. Taylor measured the alternative cost of producing the energy at Box Canyon by comparing the cost of the dam with the cost of constructing an alternative generating plant. See PGE I, 1980 WL 24161, ("net benefits analysis is intended to determine the dollar advantage of building [the hydropower plant] instead of the next-best source of generation"). The district court rejected that testimony and did not use the cost of building an alternative power source as an alternative measure. Instead, the court used the cost of a special firm power rate available to PUD to purchase power from existing projects, believing the result of the other method resulted in too high an award:
 
 1. Alternative Costs
 
 43
 The U.S./Tribe sought to use as alternative costs, the cost of new plants being constructed while the [PUD] used the preference rate charged public utility districts by the Bonneville Power Administration ("BPA"). To use the U.S./Tribe's formula would create a massive windfall to the Tribe and result in unreasonable increases in the power rates.
 
 
 44
 The United States and the Tribe claim that it was error to use any measure for alternative costs other than the cost of construction of an alternative source of power. They argue that the district court's only reason for choosing its method of valuation was the court's conviction that the cost of constructing an alternative power source would produce an unreasonably high award.
 
 
 45
 This case, however, is not the standard case, and a review of the record shows that the district court focussed on the facts of the case as well as the Commission's stated purpose to protect ratepayers from unreasonable increases. The district court heard testimony from Dr. Taylor that the Indian lands, located as they were in a thin "ribbon" or "bathtub ring" at the top of the reservoir, were "incremental" to the project, and that the extra power generated from flooding above 2028 feet was "incremental" or "windfall" power. The court characterized this as meaning that
 
 
 46
 it does cost a little bit more to produce power above 2028, but it is going to be a relatively small percentage because all of your basic fixed costs have been put in the ground and are there.... [The costs of the additional power] bear a considerably different cost than you would in just getting up to 2028....
 
 
 47
 The court heard testimony that PUD owned the entire dam site and that PUD bought power from the BPA before and (in a reduced amount) after the dam's construction. The court asked whether the utility could generate power at 2028 feet, and after testimony that it could, characterized the increase as
 
 
 48
 getting to the higher level where your fixed costs are essentially the same and you are really cutting the fat hog because you are up at the upper part where every company wants to be where you are at the maximum just before you hit the point of diminishing returns.
 
 
 49
 The district court characterized this case as unique: "All of you have got cases that deal with Government dams, or with other kinds of dams, nobody has a PUD dam that has trespassed on an Indian reservation. We get-you know, this is a virgin case, so that is it."
 
 
 50
 The district judge characterized this case as different because the Indian lands were "incremental" to the original boundaries of the project, and the power generated by flooding the lands was "windfall" or extra power. The measure for the alternative cost of the windfall was not the cost of constructing an entirely different alternative project, but the cost of buying extra power from the BPA. If PUD had not trespassed on the Indian lands, it would have had to purchase "extra" power elsewhere; it would not have had to build an alternative project. Given the flexibility the Commission itself has identified in determining power site value and the statute's requirement that charges be "reasonable," it was not clearly erroneous to choose this measure of alternative cost. Kalispel II made no mention of how to implement the details of a power site analysis, and the Commission precedent is "sparse and desperately wanting in detail." PGE I, 1980 WL 24161 at * 28. Further, the Commission appears to have allowed a similar measure of alternative costs in PGE I when it accepted BPA power rates under an existing contract as a measure of the alternative cost of energy to meet the plant's peaking capacity, i.e., power above and beyond the usual annual production. 1980 WL 24161, * 19.
 
 
 51
 The district court did, however, rely almost entirely on cost considerations when explaining why it rejected the estimate by the United States and the Tribe. Nevertheless, the United States and the Tribe must do more than claim that the district court used the wrong measure of alternative cost: they must also show that the resulting amount was unreasonable. While "[i]t is the interest of the general consuming public which serves as the paramount concern in determining a reasonable annual charge," the calculation must balance the interests of "the consumers, the licensee ... and the Indian landowners." PGE I, 1980 WL 24161 at * 3.
 
 
 52
 The United States argues that the charge is unreasonable because it is much lower than the annual charge for the project in issue in PGE I. But in that case, the western half of the dam and reservoir were located on reservation lands, id. at * 2, while none of the Box Canyon dam and only a narrow strip of the flooded area included the Indian lands in this case. The rationale adopted by the district court, that the Indian land was incremental to the project and to its production of electricity, is a reasonable basis for distinguishing PGE I.
 
 
 53
 We find it was not clear error to choose the BPA measure for the cost of alternative power.
 
 B. Assigning net benefits to the land
 
 54
 In determining how the net benefits of the incremental power generation should be divided between the flooded lands and the project operator, the district court ruled:
 
 
 55
 3. Share to Land.
 
 
 56
 In several of the FERC cases relied upon by plaintiffs, the share to land has been 50% to the power producer and 50% to the land owners. In all of these cases, the Indians owned some portion of the land underlying the dam and power plant and/or substantial portions of land used for storage of water. This case differs substantially in that all of the land underlying the dam and power station is owned by the District. Furthermore, this is a "run-of-the-river" dam which means there is no storage capacity and it would be inequitable to allocate 50% to the landowners in this case. The Court has determined under these unique facts that 40% is a more appropriate allocation.
 
 
 57
 The United States and the Tribe argue that the court erred in allocating 40 percent rather than 50 percent to the landowners.
 
 
 58
 The traditional allocation of net benefits under Section 10(e) begins with a division of net benefits into two equal parts; one of these parts is assigned to the landowners, the other to the investors who take the risks associated with developing the site. This first division gives recognition to the fact that there would exist no net benefit without both land and improvements.
 
 
 59
 . . . . .
 
 
 60
 There is good reason for the initial 50-50 sharing of net benefits.... [I]t is the ratepayer who compensates the Company for the risks taken. The ratepayer also pays all capital and operating costs so that, in a very real sense, the ratepayer has assumed the role of financier or entrepreneur....
 
 
 61
 This division of benefits between the landowners and the consuming public also serves to effect the national policy which favors the development of water power resources.
 
 
 62
 PGE I, 1980 WL at * 23-* 24; see City of Vanceburg v. FERC, 571 F.2d 630, 635 (D.C.Cir.1977) (one-half of net benefits used to compute dam-use charges).
 
 
 63
 Nevertheless, "there is not inherent in this 'method' a necessity that the division be on a 50-50 basis." Montana Power, 298 F.2d at 338 (quotation omitted). In determining "that the amount should be so divided, it is not only desirable but from the standpoint of fairness and justice there must be taken into account all of the relevant attendant circumstances including the amount, if any, of the relevant investments by the parties participating." Id.
 
 
 64
 The court thus was required to consider all the facts in evidence regarding the unusual nature of this case. The court therefore did not err by taking into account that the Tribe owned none of the land underlying the dam and power plant and no substantial portion of the land used for storage of water. The Tribe can point to no case involving similar circumstances in which a different division of damages from that ordered by the district court was chosen. We conclude that the district court did not clearly err in allotting 40 percent of the benefits to the flooded land.
 
 C. Total acreage of Indian lands
 
 65
 The final step in allocating net benefits is apportioning the share of net benefits due the land between individual landholders, on the basis of the percentage of total lands owned by each. The district court found:
 
 
 66
 4. Percentage of Land Owned by the Tribe.
 
 
 67
 The District sought to persuade the Court that it should determine the total number of acres from the high water mark (2034) from one side of the river to the other including all the river bed, resulting in a figure of 1.47% representing the percentage of land owned by the Tribe. The U.S./Tribe claimed 13% and attempted as part of their rebuttal to increase that figure to 17%. The Court disallowed plaintiffs' latter figure as being in violation of the Court's pretrial orders and improper rebuttal. On cross examination, the District submitted figures that showed that the portion of the land at issue on the riverbank between 2028 and 2035 was 8.1%. (This was based on a determination of 2,274 acres divided by 186.07 acres held by the United States for the benefit of the Kalispel Indian Tribe and individual allottees.) The Court has determined that the 8.1% figure most closely approaches a reasonable basis on which to determine damages.
 
 
 68
 The determination of the area of the Tribe's submerged land, and the total acreage of the submerged land in the ribbon, is a purely factual question. The Tribe argues that the total acreage of submerged incremental land was not 2,274 acres but 1,105 acres, based on testimony submitted from the 1987 trial. Other testimony, however, supports the finding that 2,274 acres of incremental land was submerged.
 
 
 69
 It is not possible to evaluate the accuracy of the measurements on appeal. The district court made its findings after hearing extensive testimony and evaluating the different methods of measurement. We do not find the result to be clearly erroneous.
 
 
 70
 The Tribe also complains that the district court improperly excluded evidence supporting its alternative calculation. The district court knew of the 13 percent figure arrived at by Dr. Taylor, and refused to allow further testimony from another expert witness using different survey maps, on the ground that it should have been presented as part of the case in chief. The United States and Tribe argued that it was rebuttal evidence. The district court refused to allow the testimony after an offer of proof in which the witness testified that he would estimate the Indian's percentage at 17.8 percent. The district court did not abuse its discretion in excluding the evidence under Federal Rule of Evidence 403, which provides "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The district court reasonably could have concluded that introducing in rebuttal yet a third, much higher estimate of the percentage of Tribal land would needlessly complicate the issue and unduly delay the proceeding.
 
 D. Impact of a rate increase
 
 71
 In its amended judgment, the district court stated that the Tribe's proposed judgment of about $30 million
 
 
 72
 would increase the rates 3.10 mills/kwh. It is doubtful that the District could sell bonds in this amount for a nonrevenue producing purpose or otherwise borrow the money to pay such an outrageous amount. Furthermore, the large commercial user is in a rate-sensitive business and if forced to pay 80% of a $29 million judgment would undoubtedly relocate, thereby depriving the district of its main consumer.
 
 
 73
 The "large commercial user" referred to was Ponderay Newsprint, which came into PUD's service area in Pend Oreille County in the late 1980s. See City of Seattle v. FERC, 923 F.2d 713, 714-15 (9th Cir.1991). The Tribe argues that these conclusions are not supported by the evidence. Yet the court heard testimony that the newsprint plant might leave if utility rates increased and that the impact of that departure would be severe. The district court thus did not clearly err in its evaluation of this evidence.
 
 III. Prejudgment interest
 
 74
 The court awarded prejudgment compound interest at 90 percent of prime rate. PUD claims any award of prejudgment interest was inappropriate, and that the rate was unreasonable. The Tribe claims any amount below prime was unreasonable. This court reviews an award of prejudgment interest for an abuse of discretion. Home Sav. Bank v. Gillam, 952 F.2d 1152, 1161 (9th Cir.1991).
 
 
 75
 Prejudgment interest has become a familiar remedy widely recognized by federal courts as a means to make a plaintiff whole against a dilatory defendant.... [M]oney has a time value, and prejudgment interest is therefore necessary in the ordinary case to compensate a plaintiff fully for a loss suffered at time t and not compensated until t + 1. Moreover, prejudgment interest is a well-established remedy in this circuit.
 
 
 76
 Hopi Tribe v. Navajo Tribe, 46 F.3d 908, 922 (9th Cir.) (citations and quotations omitted), cert. denied, 516 U.S. 931, 116 S.Ct. 337, 133 L.Ed.2d 236 (1995). "[I]nterest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness." Board of Comm'rs of Jackson Cty. v. United States, 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313 (1939).
 
 
 77
 PUD argues that the award was punitive to it and a windfall to the Tribe. But the Tribe lost the use of its land for forty years while PUD reaped the benefits of additional power generation. We conclude that it was not an abuse of discretion to award prejudgment interest.
 
 
 78
 PUD argues that the rate of 90 percent of prime is excessive, and that compound interest is inappropriate. But the rate of interest is supported by PUD's own evidence that it receives 90 percent of prime interest on its invested funds. The Commission charges compound interest and has applied regulations requiring interest at the prime rate in computing retroactive readjustment of annual charges. See 18 C.F.R. § 35.19a(a)(2) (1997).
 
 
 79
 The Tribe argues that it was an abuse of discretion to award less than the prime rate because the Commission's regulations specify prime rate. Those regulations, however, specify a variety of rates depending on when the charges were incurred, id., and do not control the court's discretion in awarding interest for the loss of the use of land.
 
 
 80
 The decision to award prejudgment interest, and the amount awarded, were not an abuse of discretion.
 
 IV. PUD's condemnation action
 
 81
 In Kalispel II, the court held that PUD "may not condemn tribal lands embraced in a reservation under the Power Act or any other federal statute, and may not take the land of individual Indian allottees through inverse condemnation." 28 F.3d at 1548 (citations omitted). The court noted, however, that PUD "may be able to condemn land held in trust by the United States for the benefit of individual Indian allottees under 25 U.S.C. § 357." Id. at 1551-52.
 
 
 82
 After remand, PUD asserted a counterclaim to condemn the allotted lands. The district court granted the United States' and Tribe's motion for partial summary judgment dismissing the claim.
 
 
 83
 Lands allotted to individual Indians may generally be alienated under 25 U.S.C. § 357, which provides:
 
 
 84
 Lands allotted in severalty to Indians may be condemned for any public purpose under the laws of the State or Territory where located in the same manner as land owned in fee may be condemned, and the money awarded as damages shall be paid to the allottee.
 
 
 85
 The United States and the Tribe argue that § 357 was repealed by the Federal Power Act, which in §§ 4(e) and 10(e) require that the utility obtain a license from the United States for the use of its lands, and pay reasonable charges for the use of Indian lands. The district court concluded that § 357 had not been repealed by the FPA. Lands of individual Indian allottees could be obtained for a power project either through condemnation under § 357, or by obtaining a license and paying an annual charge. See Southern Cal. Edison v. Rice, 685 F.2d 354, 356 (9th Cir.1982) (no special protection against condemnation for allotted lands).
 
 
 86
 But the continued vitality of § 357 is largely irrelevant to the disposition of this case, because under the circumstances here the statute cannot be used to condemn the lands. The United States retains a proprietary interest in the allotted lands. Minnesota v. United States, 305 U.S. 382, 385, 59 S.Ct. 292, 293-94, 83 L.Ed. 235 (1939). The consent of the United States is required before the lands can be condemned. See Rice, 685 F.2d at 357. The United States, a party to this appeal strongly opposing PUD's condemnation of the land, certainly does not consent. Nor does FPC v. Tuscarora Indian Nation, 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960) help PUD, because PUD has no license issued by the Commission. Id. at 100, 123, 80 S.Ct. at 545, 557. PUD cannot condemn the Indian allotted lands.
 
 
 87
 The district court did not err in granting summary judgment dismissing PUD's counterclaim for condemnation.
 
 V. Injunction
 
 88
 Before Kalispel II, the district court had declined to issue an injunction against further flooding of Indian lands on the ground that the Indians would be fully compensated in a condemnation proceeding by PUD. The Kalispel II court held this to be error, and on remand directed the court to consider whether to issue an injunction, suggesting that to minimize the harm caused by such an injunction "[t]he court could, for example, enjoin the Utility from occupying Reservation land but stay the order to permit the Utility to seek an amendment to its license and satisfy the Power Act, especially § 4(e) and § 10(e)." 28 F.3d at 1552.
 
 
 89
 The district court did issue such a permanent injunction after finding that it would not cause a major power outage. It then immediately stayed the injunction
 
 
 90
 for that amount of time which is necessary for FERC to act upon the District's application. This stay is specifically conditioned on: (1) the District's promptly submitting an application to FERC for authority to flood up to 2035; (2) the District paying the judgment in full with interest from this date forward within one year or secure the funds from other sources for the payment of the judgment; and (3) the district paying to the Tribe on an annualized basis a fee for continuing to flood the land above 2028.
 
 
 91
 (footnote omitted). This court reviews the issuance of the injunction and of the stay for an abuse of discretion. American-Arab Anti-Discrimination Committee v. Reno, 70 F.3d 1045, 1066 (9th Cir.1995); MacKillop v. Lowe's Mkt., Inc., 58 F.3d 1441, 1446 (9th Cir.1995), cert. denied, 516 U.S. 1113, 116 S.Ct. 914, 133 L.Ed.2d 844 (1996).
 
 
 92
 PUD claims the injunction was an abuse of discretion, because the district court did not consider evidence it presented of damage to fish and wildlife if the flooded lands were restored to their original state, and the negative impact of the resulting loss of additional power. We reject this argument. The district court considered the evidence PUD presented, and concluded that irreparable harm would not follow from dropping the reservoir down to 2028 feet to end PUD's illegal trespass. The court did not abuse its discretion.
 
 
 93
 Conversely, the United States and the Tribe contend it was an abuse of discretion to stay the injunction pending an application by PUD to amend its license, because PUD had already delayed for so long to seek such an amendment. As indicated above, however, this court had previously indicated that the injunction could be stayed. See Kalispel II, 28 F.3d at 1552. If PUD is not in compliance with the terms of the stay, the United States and the Tribe may move in the district court for a lifting of the stay.
 
 VI. Easements
 
 94
 PUD claims that the district court failed to consider that it held some easements on Indian land and sought additional easements. As PUD itself acknowledges, those easements did not cover all the Indian lands, did not provide for year-round flooding, and did not extend to 2035 feet. Nevertheless, PUD claims that the judgment requires it to "pay twice for the same rights."
 
 
 95
 We disagree. As the Kalispel II court stated, "the Utility knew it had no right to flood Reservation land, but flooded it anyway.... The Utility obtained easements to flood land neighboring the Reservation. It flooded the land at issue here only after the Kalispel Indians refused to grant similar easements." 28 F.3d at 1547 & n. 2. Partial easements are not an antidote to trespass damages.
 
 
 96
 We note that after the district court's judgment in this case, PUD filed a petition for declaratory order or, in the alternative, a motion to amend its license with the Commission. In Public Utility Dist. No. 1 of Pend Oreille County, 77 FERC 61,146 (November 13, 1996), 1996 WL 659542, the Commission described PUD's flooding of the reservation lands and the litigation, and then rejected PUD's request that it find the current license authorized it to occupy the Kalispel reservation lands. 1996 WL 659542, * 8. The Commission also rejected as irrelevant PUD's claims that it attempted in good faith to get easements on the reservation lands. "It is not clear what relationship this issue bears to the Commission's exercise of its responsibilities under the FPA, since in any event the easements were not obtained." Id. at * 13.
 
 CONCLUSION
 
 97
 We affirm the district court's amended judgment.
 
 FERGUSON, Circuit Judge, dissenting:
 
 98
 For forty years, the Pend Oreille County public utility has maintained a trespass on tribal and allotted trust lands of the Kalispel Indian Reservation in Northeastern Washington. The majority's decision denies the Kalispel landowners the compensation and injunctive relief to which they are entitled and contravenes the deterrent purpose of the assessment of damages under the Federal Power Act. For these reasons, and because the district court clearly erred in assessing damages against the public utility and abused its discretion in granting an indefinite stay of injunction, I must dissent.
 
 1. Factual and Procedural Background
 
 99
 In 1952, the Pend Oreille County Public Utility District No. 1 ("PUD") obtained a license from the Federal Power Commission to construct and operate a hydroelectric dam. Since its operation began in 1955, the dam has caused portions of the nearby Kalispel Reservation, formerly flooded only in the spring, to be flooded year round. The district court concluded that the Kalispel Tribe was entitled to damages in trespass for its lost use of this submerged riparian land. United States v. Pend Oreille Pub. Util. Dist. No. 1, No. 80-116 (E.D. Wa. filed Aug. 10, 1987), aff'd, 926 F.2d 1502 (9th Cir.1991).
 
 
 100
 Under section 10(e) of the Federal Power Act, 16 U.S.C. § 803(e), licensees of hydropower projects that use or occupy reservation land must pay a compensatory charge to the governing tribe. "[W]hen licenses are issued involving the use of ... tribal lands embraced within Indian reservations the [Federal Energy Regulatory] Commission shall, ... subject to the approval of the Indian tribe having jurisdiction of such lands[,] ... fix a reasonable annual charge for the use thereof ..." 16 U.S.C. § 803(e).
 
 
 101
 In 1980, the United States, acting as trustee of the Kalispel land, sued PUD in district court. In 1983, the district court held that PUD had trespassed on Kalispel land, and in 1987 held that damages were only equal to the land's value for grazing. The issue of damages was appealed to this Court, which reversed and remanded. United States v. Pend Oreille Pub. Util. Dist. No. 1, 28 F.3d 1544, 1551 (9th Cir.1994)(hereinafter "Kalispel II "). In doing so, the Kalispel II panel set out the "power site formula" by which the district court was to assess damages:
 
 
 102
 Although use of the value of the tribal lands as part of the power project in calculating the annual charge is not compelled by regulation or case law, we nevertheless conclude it is the most acceptable measure of damages for the Utility's trespass.... [T]his is the formulation now applied by the Commission in fixing annual charges for use of tribal lands on all power projects.
 
 
 103
 Id. at 1551. On remand, the district court calculated the annual charge, which the majority now affirms. However, the district court clearly erred in its application of the power site formula mandated by this Court in Kalispel II.
 
 
 104
 2. The District Court Incorrectly Applied the Power Site Formula
 
 
 105
 a. Standard of Review
 
 
 106
 Where, as here, the district court must answer a mixed question of law and fact, the standard of review is determined by whether the question is predominantly legal or factual. "If the application of the rule of law to the facts requires an inquiry that is 'essentially factual,' ... founded 'on the application of the fact-finding tribunal's experience with the mainsprings of human conduct' ... [then it is] reviewable under the clearly erroneous standard." United States v. McConney, 728 F.2d 1195, 1202 (9th Cir.1984), citing Commissioner v. Duberstein, 363 U.S. 278, 289, 80 S.Ct. 1190, 1198-99, 4 L.Ed.2d 1218 (1960). However, if the district court must "exercise judgment about the values that animate legal principles," then review must be de novo. Id. Here, application of the power site formula is predominantly factual and therefore must be reviewed for clear error.
 
 
 107
 b. Application of the Formula
 
 
 108
 The power site formula consists of a three step, net benefits analysis. First, the cost of generating power at the site is compared to the cost of generating power at the next best alternative site. The difference equals the net benefits of generating power at the site in question. Second, the benefits are divided between the owner of the dam and the owner of the land. Each receives half the benefits because each is equally integral to the operation of the site. Portland Gen. Elec. Co., 12 FERC p 63,055, 65,230 (1980), 1980 WL 24161, at * 23 (hereinafter "PGE I "), citing Escondido Mutual Water Co., Opinion No. 39, 6 FERC p 61,189, 61,387 (1979). If there are multiple landowners, the third step determines the percentage of the land belonging to each, so that each may receive a proportionate share of the benefits. PGE I, 12 FERC at p 65,231, 1980 WL at * 25.
 
 
 109
 First, the district court failed to compare the cost of building and operating the instant project to the cost of generating the same amount of power at a hypothetical, next best alternative project. Instead, it compared the cost of power generation using the dam to the purchase price of energy available on the market, which is obviously lower than the price of alternative power generation. The damages were further diminished by the district judge's application of the discounted purchase price which PUD receives as a public utility.
 
 
 110
 Second, the net benefits were not divided equally between the landowners and the utility company. Id. This division of benefits is intended to accommodate FERC's policy objectives of encouraging hydropower development while also reasonably compensating the landowners. See Portland Gen. Elec. Co., 20 FERC p 61,294 (1982), 1982 WL 40297 (hereinafter "PGE II "); Portland Gen. Elec. Co., 12 FERC p 63,055 (1980), 1980 WL 24161 (hereinafter "PGE I "). At trial, expert economists on both sides testified that the standard division of net benefits is fifty-fifty. Nonetheless, the district court attributed sixty percent of the net benefits to PUD and forty percent to the Kalispel Tribe. This unprecedented division was based on the location of the lands owned by each party. Because the Kalispel lands are located on the rim of the reservoir, the district court assumed them to be less valuable than PUD's land under the dam. However, the only power at issue here is that generated by the flooded Kalispel land on the rim of the reservoir. Its value compared to land underneath the dam is irrelevant. Furthermore, considering the location of land in establishing its value for this purpose was expressly rejected in PGE I, 12 FERC p 63,055 (1980), 1980 WL 24161 at * 25.
 
 
 111
 Third, the district court failed to accurately determine what percentage of the project land belonged to the Kalispel Tribe. The district court rejected initial figures submitted by each side, then accepted a new figure offered by PUD, stating: "The Court has determined that the 8.1% figure most closely approaches a reasonable basis on which to determine damages." However, the 8.1% figure was calculated incorrectly. PUD's expert simply subtracted the surface area of the reservoir at 2028 feet from the surface area at 2035 feet. This calculation determines only the increase in the surface area of the reservoir after flooding, not the area of the lands submerged, which is sloped. Therefore, the district court's conclusion that the Kalispel Tribe owned 8.1% is not accurate.
 
 
 112
 In general, the district court unjustifiably abandoned the mandated legal analysis in calculating damages. For example, the district judge described his method thus: "I will be honest with you, I am not going to use it because the result is so skewed that it is just, you know, out of sight." Similarly, the district judge stated: "you cut a bunch of that stuff out and you get a figure or you can look at it and say this kind of--this passes the gut check or the smell test or whatever. I think this is the right result, now I will go back and justify it." Working backward from a subjective belief about the amount of damages is particularly perilous where the damages are increased by forty years of unpaid interest. Such a method violates the fundamental fairness guaranteed by the Due Process Clause. U.S. CONST. amend. XIV, § 1; Dowling v. United States, 493 U.S. 342, 352-53, 110 S.Ct. 668, 674-75, 107 L.Ed.2d 708 (1989). In this case, forty years of unpaid interest worked to the detriment of property owners. The district court's method contravenes the deterrent purpose served by accurately assessing trespass damages with interest.
 
 
 113
 The district court failed to correctly apply any of the three steps of the mandated net benefits analysis, and its decision was therefore clearly erroneous.
 
 
 114
 3. The District Court Abused its Discretion in Granting an Indefinite Stay of Injunction
 
 
 115
 We review the district court's stay of injunction for abuse of discretion. Complaint of Paradise Holdings, Inc., 795 F.2d 756, 760 (9th Cir.1986). Here, the district court enjoined PUD from flooding the Kalispel land and simultaneously stayed that injunction. In Kalispel II, this Court ordered the following:
 
 
 116
 [T]he district court should consider whether to issue an injunction in light of ... the Utility's and State's assertion that a large part of the Pacific Northwest would suffer a power shortage if the Utility were enjoined from flooding ... If the district court decides to enjoin the flooding, it could fashion a remedy to minimize the harm such an injunction might cause. The court could ... stay the order to permit the Utility to seek an amendment to its license ...
 
 
 117
 Kalispel II, 28 F.3d at 1552. In short, this Court directed the district court to consider the risk of a massive power outage as a basis for denying or staying the injunction. In its order, however, the district court stated: "No evidence was introduced at trial which would indicate that any major power shortage would occur in Pend Oreille County or the city of Seattle." United States v. Pend Oreille Pub. Util. Dist. No. 1, No. 80-116 at 5 (E.D. Wa. filed Aug. 10, 1987), aff'd, 926 F.2d 1502 (9th Cir.1991). Nonetheless, the district court issued a stay of unlimited duration. It stated: "In order to allow [PUD] to apply to FERC for an amendment to its license to flood above 2028 to 2035 and to allow [PUD] to generate sufficient power to pay this judgment, this Court will stay the permanent injunction ..." Id. In so doing, the district court abused its discretion. This Court provided for a stay for the purpose of licensing if the region would suffer widespread loss of power without such a stay. The purpose of seeking a license, without more, does not justify a stay.
 
 
 118
 The district court's second rationale also fails to support the stay. The idea that a trespass should be prolonged to assist the trespasser in the payment of damages stemming from the same trespass makes neither legal nor economic sense. Finally, a stay with no specific time limit is particularly inappropriate where, as here, the trespasser has used dilatory tactics[1] to evade its obligation to compensate the landowner and cease its unlicensed use of the land.
 
 4. Conclusion
 
 119
 The district court clearly erred in its application of the power site formula, abandoning the analysis mandated by this Court for each of the formula's three steps. Further, the district court abused its discretion in granting an indefinite stay of injunction.
 
 
 120
 I DISSENT for the reason that we cannot condone the abandonment of legal principles and precedent in favor of subjective beliefs when adjudicating Indian property rights.
 
 
 
 [1]
 As noted by this Court in Kalispel II, PUD attempted to relitigate the existence of a trespass, which had been found by the district court and affirmed on appeal. Kalispel II, 28 F.3d at 1547